DAVIDOFF HUTCHER & CITRON LLP                    *Hearing Date: February 18, 2025*
120 Bloomingdale Road                            *Hearing Time: 10:00 A.M.*
White Plains, New York 10605
(914) 381-7400
Jonathan S. Pasternak
*Attorneys for the Debtor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                           Chapter 11

MADISON 33 OWNER LLC,                            Case No.:  1:24-bk-11463 (PB)

                              Debtor.
------------------------------------------------------------x

## MOTION FOR ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING ON A SENIOR PRIORITY BASIS, (II) GRANTING PRIMING LIENS PURSUANT TO SECTION 364(d) OF THE BANKRUPTCY CODE AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTION 364(c)(1) OF THE BANKRUPTCY CODE, AND (III) GRANTING RELATED RELIEF

Madison 33 Owner LLC, as debtor and debtor in possession (the "Debtor"), respectfully

states as follows in support of this motion (the "Motion") in the above-captioned chapter 11 case

(the "Chapter 11 Case"), pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 362(c)(3),

364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code 11 U.S.C. §§ 101, *et*

*seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the Southern

District of New York (the "Local Bankruptcy Rules"), seeking entry of an order, among other

things: (1) authorizing the Debtor to obtain post-petition financing ("DIP Priming Financing") on

a senior priority basis pursuant to a priming senior secured debtor-in-possession term loan in

accordance with and subject to the terms and conditions set forth in the DIP Commitment Letter

(as defined herein) in the aggregate principal amount not to exceed $22,000,000 (the "DIP Priming Loan"), which shall be made available to the Debtor in accordance with and subject to the terms of the DIP Commitment Letter and the Budget (as defined herein); (2) authorizing the Debtor to execute, deliver and perform under the DIP Commitment Letter and all other loan documentation related to the DIP Priming Loan (collectively, with the DIP Commitment Letter, the "DIP Priming Documents"); (3) authorizing the Debtor to incur obligations with respect to loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, costs, expenses and other liabilities, all other obligations due and payable under the DIP Priming Documents (collectively, the "DIP Obligations"); (4) granting to Castellan Capital LLC or its affiliate as lender (the "DIP Lender") both a senior priming mortgage covering the DIP Collateral (as defined below) set forth herein, plus an allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations; (5) granting to the DIP Lender valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below) and all proceeds thereof; (6) authorizing the Debtor to use proceeds of the DIP Priming Loan solely in accordance with and subject to the Budget and the DIP Priming Documents; (7) authorizing the Debtor to pay the principal, interest, fees, expenses and other amounts payable under the DIP Priming Documents as such become earned, due, and payable to the extent provided in, and in accordance with and subject to, the DIP Priming Documents; (8) modifying the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor to effectuate the terms and provisions of the DIP Priming Documents; and (9) granting related relief.

**RELIEF REQUESTED**

1.      The Debtor seeks entry of an order substantially in the form attached hereto as

**Exhibit E** (the "DIP Priming Order"), pursuant to sections 362 and 364 of the Bankruptcy Code

and Bankruptcy Rule 4001(c), granting the following relief:[1]

- DIP Facility: Authorizing the Debtor to obtain post-petition financing (the "DIP Priming Loan") pursuant to a $22,000,000 senior secured, superpriority and priming debtor-in-possession term loan credit facility (the "DIP Facility"), subject to the terms of that certain Financing Commitment Letter (the "DIP Commitment Letter") and the Budget (as defined herein), in each case substantially in the form attached hereto as **Exhibit A**;

- DIP Priming Liens and Superpriority Claims: Granting the DIP Priming Liens on the DIP Collateral to secure the DIP Obligations with the relative priorities set forth in the DIP Priming Order, subject to the terms set forth in the DIP Facility; and

- Automatic Stay: Modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and conditions of the DIP Priming Order, subject to the terms of the DIP Facility.

2.      In support of this Motion, the Debtor submits the *Declaration of David Goldwasser

in Support of Debtor's Motion (I) Authorizing the Debtor to Obtain Post-Petition Financing on a

Senior Priority Basis, (II) Granting Priming Liens Pursuant to Section 364(d) of the Bankruptcy

Code and Providing Superpriority Administrative Expense Status Pursuant to Section 364(c)(1) of

the Bankruptcy Code, and (III) Granting Related Relief* attached hereto as **Exhibit F** (the

"Goldwasser Declaration").

**JURISDICTION AND VENUE**

3.      On August 26, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

---

[1]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

4.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the District Court, dated July 10, 1984 (Ward, Acting C.J.). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtor confirms its consent to the entry of a final order by this Court regarding this Motion.

5.      Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.

6.      The statutory predicates for the relief requested herein are Sections 105, 362, 364, 503, and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 4001.

7.      No trustee or examiner, and no official committee has been appointed in the Debtor's Chapter 11 Case.

**Concise Statement Pursuant to Bankruptcy Rule 4001**
**Regarding the Terms of the Proposed DIP Priming Loan**

8.      In accordance with Bankruptcy Rules 4001(c) and 4001(d), the following is a concise statement and summary of the proposed material terms of the DIP Priming Loan as provided for in the DIP Facility, the DIP Commitment Letter, and the DIP Priming Order:

| DIP Facility Terms | |
| --- | --- |
| Lender: | Castellan Capital LLC (the "DIP Lender") |
| Total Loan Amount: | $22,000,000 (the "Maximum Loan Amount") |
| Interest Rate: | 30-day AMERIBOR (AMBOR30T) + 5.12% (currently 9.49%), with a floor rate of 9.25% adjustable monthly (the "Contract Rate"). Interest will be paid current on an actual/360 basis and paid current on a monthly basis. A late fee of 6.0% shall apply to any payments (inclusive of any escrow payments) received after the fifth (5th) day of the month. |

| | |
|---|---|
| Prepayment: | No prepayment penalty. |
| Minimum Interest: | No minimum interest period. |
| Maturity: | Twenty-four (24) months. |
| Origination Fee: | 3% ($660,000.00) with DIP Lender to pay brokerage. |
| Application Fee: | $40,000, including the $15,000 pre-paid deposit funded by third parties. |
| Collateral: | • First priority "priming" mortgage lien pursuant to 11 U.S.C. Section 364(d) covering units PHA, PHB, PHC, PHD, PH Sky, CV-A, CV-B, 11B, 15B, 17B, 18B and 27A at the above referenced Property, together with all related rights (the "DIP Collateral");<br>• Assignment and security interest in all current and future leases relating to the DIP Collateral;<br>• Assignment of all plans, contracts, approvals, licenses, and permits;<br>• UCC liens on all personal property, equipment and fixtures in the DIP Collateral; and<br>• Completion Guarantee for C of O and Condo Book. |
| Interest Reserve: | At closing, the DIP Lender shall establish an Interest Reserve equal to approximately two million five hundred and nineteen thousand dollars ($2,519,000) to be released. To the extent there is any shortfall, Debtor shall pay the difference in accordance with the terms of the Note. |
| Construction Reserve: | At closing, the DIP Lender shall establish from the loan proceeds a Construction Reserve account of approximately fourteen million and two hundred thousand dollars ($14,200,000) to be drawn upon for work completed on the DIP Collateral per the approved budget. Debtor shall provide invoices, lien release waivers, and any other requested documentation at DIP Lender's reasonable discretion under a certified requisition prior to disbursement. Interest shall only be charged on Construction Reserve funds once disbursed. |
| Other Costs: | Debtor agrees to reimburse the DIP Lender at Closing for any share of taxes due from DIP Lender for mortgage recording or property transfer, it being understood that the DIP Priming Loan shall be subject to conventional loan documents and recordable mortgage instruments. |

## BACKGROUND

### A.    The Debtor's Business

9.    Formed on July 23, 2013, the Debtor is a domestic limited liability company organized and existing under the laws of the State of Delaware with an address of 6 Red Oak Lane, Spring Valley, New York 10977.

10.    The Debtor is the sponsor and developer of condominium units located at 172 Madison Avenue, New York, New York (the "Property").

11.    The Property is a fully constructed 33-story mixed-use luxury high rise condominium, with 72 units. Only twelve (12) units remain unsold at this time. The unsold units are fully constructed and include five (5) non-penthouse units (the "Apartment Units"), and (5) penthouse units (including one "sky house") in "white box" condition (the "Penthouse Units" and together with the Apartment Units, the "Residential Units"), and two commercial units (the "Commercial Units" and together with the Residential Units, the "Pledged Units"). The Debtor believes the fair market value of the Residential Units is no less than $100,600,000. The Debtor estimates that it would cost approximately $14,055,847 (including hard and soft costs, related fees, and expenses) to finish the Penthouse Units before they can be sold at optimum value.

### B.    The Pre-Petition Loan Agreements

12.    On October 28, 2013, the Debtor acquired the Property through a bankruptcy sale. The Debtor provided $24,000,000.00 of its own capital in connection with the acquisition. To fund the rest of the acquisition of the Property and later build out costs, the Debtor and Madison 33 Partners, LLC (the "Owner") entered into a series of loans with Deutsche Bank, AG ("DB") pursuant to that certain loan in the original principal amount of $75,852,054.53 (the "Senior Loan"), that certain loan in the principal amount of $3,400,000.00 (the "Building Loan"), and that

certain loan in the principal amount of $8,351,444.39 (the "Project Loan" and, collectively, with the Senior Loan and the Building Loan, referred to herein as the "Pre-Petition Loan Agreements").

13.    The Pre-Petition Loan Agreements were collateralized by both the Property and the Debtor's member interests in the Owner (the "Prepetition Collateral"). The Debtor's sole asset is the Property. The Owner is the sole member of the Debtor.

14.    In or around August 2014, excavation at the Property commenced, and around April 2015 construction and marketing commenced at the Property with permitting and approvals in place. The first closing for a unit at the Property occurred on May 19, 2017. To date, 60 units have been sold for an aggregate total price of $162,578,630, which net proceeds were paid to DB to reduce the loan obligations down to an estimated $43.5 million.

15.    Despite the Owner's continued sales and continued payments to DB, DB declared a maturity default under the Pre-Petition Loan Agreements on or around February 2022. Notwithstanding, the Debtor believes DB's invoking of a default was not made in good faith or under any standards of fair dealing. During this period, equity holders and unsecured creditors of the Debtor contributed another estimated $6,499,648.28 in personal funds and capital calls to continue with its sale and marketing process of the unsold units at the Property, and to date there has not yet been any return or distributions to equity or unsecured creditors.

16.    The Owner moved to cure the alleged default immediately and despite its efforts to negotiate with DB, DB continued to hold the Owner in default. As a result, the Owner halted sales of the Residential Units until it could resolve the open issues with DB. The Debtor understands that the Pre-Petition Loan Agreements were assigned by DB to Palm Avenue Hialeah Trust, a Delaware statutory trust, for and on behalf of and solely with respect to Series 2023-3 ("Palm

Avenue"). Palm Avenue has asserted that $62,624,337.02 is currently outstanding under the Pre-Petition Loan Agreements.

17.     Following such assignment, the Debtor engaged in extensive negotiations with Palm Avenue. Notwithstanding this fact, on April 3, 2024, Palm Avenue scheduled a UCC-1 foreclosure sale of the Debtor's member interests in the Owner ("Foreclosure Sale") for June 4, 2024. To preserve the Debtor's management and ownership interests in the Property, the Debtor filed its Chapter 11 Case.

18.     The Debtor is in the process of hiring a broker to sell the Apartment Units which remain unsold and arranging to complete the Penthouse Units.

**C.     The Debtor's Urgent Need for the DIP Facility.**

19.     As the Court is aware, the Debtor has no cash on hand or current income to generate cash to pay for ongoing administrative expenses. Moreover, the Debtor intends to utilize this Chapter 11 Case to complete and sell the Penthouse Units, market and sell the remaining Apartment Units, and attempt to reach a settlement with its lenders and other creditors. A copy of the AIA agreement for completion of the construction of the Penthouse Units is attached as **Exhibit B**. A construction budget and timeline are attached as **Exhibit C**.

20.     In order to be able to realize the potential maximum value of the Property to repay all creditors in full, the Debtor believes the Penthouse Units at the Property should be completed and all remaining Apartment Units should be sold. The Debtor has spent the last few months obtaining estimates for the completion of the Penthouse Units to occupancy and related sale costs and expenses. In addition, there are various "soft costs" that will be incurred notwithstanding the completion of the Penthouse Units and sale of the Apartment Units. These costs include, *inter alia*, (a) insurance, (b) utilities, (c) taxes, (d) the Chapter 11 Professionals, (e) condo charges, (f) U.S.

Trustee fees, and (g) other ordinary and necessary expenses to maintain the current condition of the Property pending the filing of a plan and/or consummation of a sale, refinance, or other strategic transaction.

21.    Given the default on its existing Pre-Petition Loan Agreements, it would appear futile to ask Palm Avenue to make any additional loans to the Debtor. Nonetheless, the Debtor requested that Palm Avenue enter into a loan with Debtor, and, unsurprisingly, Palm Avenue refused.

22.    Accordingly, the Debtor's only hope to obtain the badly needed financing necessary to complete the Property is to seek a DIP priming loan from other lenders.

**D.    The DIP Facility**

23.    To that end, the Debtor has obtained a loan commitment ("Loan Commitment") from the DIP Lender for a total loan of $22,000,000, which net proceeds therefrom should give the Debtor sufficient capital to complete the Penthouse Units, commence the sale of the Apartment Units, and cover all other administrative expenses in the Chapter 11 Case. These funds will also permit the Debtor to remain current and pay all condo charges and real estate taxes that come due or are outstanding. The DIP Lender shall distribute the funds under the DIP Priming Loan pursuant to the budget (the "Budget") attached hereto as **Exhibit A**. The Debtor believes that the DIP Priming Loan will provide sufficient liquidity, on a sufficient timeline, to complete the Penthouse Units' construction, market and sell all of the Residential Units, pay the associated costs of the Chapter 11 Case, and pay all other necessary amounts, including taxes and condo charges, all in line with the Budget and the construction timeline attached hereto as **Exhibit C**. The DIP Priming Loan amounts, and the timeline, also comport with timeframe and amounts required under the AIA agreement for the construction and completion of the Penthouse Units.

9

24.     Accordingly, the Debtor has determined, in its independent business judgement, that obtaining the DIP Financing from the DIP Lender on the terms and conditions set forth in the DIP Commitment Letter provides the estate with the best chance to maximize a return to creditors in the Chapter 11 Case and is therefore in the best interests of creditors, and that absent obtaining the DIP Priming Loan from the DIP Lender, the Chapter 11 Case is likely to be forced into Chapter 7 and forced liquidation.

25.     Absent access to the funds available under the DIP Priming Loan, the Debtor will promptly lack sufficient liquidity to continue its operations. Therefore, the Debtor has an immediate need to access the DIP Priming Loan.

### E.     Alternative Sources of Financing Are Not Available on Better Terms

26.     Despite the Debtor's efforts to identify out of court and post-petition financing over the past several months, the Debtor has not received any financing proposals that would adequately fund the chapter 11 process and the completion of the Property.

27.     Since the Petition Date, the Debtor has spoken with no less than three (3) potential investors about DIP and out-of-court financing alternatives. Despite the potential for certain out-of-court alternatives to provide the Debtor with liquidity, the quantum of capital that parties have been prepared to provide has been insufficient in light of the Debtor's capital needs and capital structure.

28.     In conjunction with outreach to a range of potential post-petition capital providers, the Debtor concluded that post-petition financing likely would have to be provided on a priming basis because the Debtor has insufficient unencumbered assets to obtain sufficient postpetition financing to responsibly prosecute this Chapter 11 Case on a junior secured or unsecured financing basis.

29.     After reviewing financing proposals from other parties that would adequately fund a chapter 11 process and provide for the construction and completion of the Penthouse Units, the Debtor has determined that the offer from the DIP Lender presents the necessary financing at the lowest and best pricing. Goldwasser Declaration ¶ 11. Accordingly, the DIP Priming Loan represents the best option available to address the Debtor's liquidity needs and create a pathway to exit from chapter 11.

## BASIS FOR RELIEF

30.     For the Debtor to obtain the necessary and essential post-petition financing it requires, the Debtor must obtain authority to enter into the DIP Priming Loan pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code.

31.     For the reasons set forth above, there is no possibility that any lender would make post-petition loan advances with simply either an unsecured, junior administrative priority provided by Section 503(b)(1) of the Bankruptcy Code, or a junior lien provided by Section 364(c)(3) of the Bankruptcy Code. In addition, the Debtor has no unencumbered assets. Therefore, the DIP Lender requires that, at the very least, it be provided with, to the extent of the post-petition advances to be made under the DIP Priming Loan, a first priority lien upon the DIP Collateral and a super priority claim pursuant to Sections 364(c)(1) and 364(d) of the Bankruptcy Code.

32.     The Debtor submits that the DIP Lender is not willing to make the necessary post-petition advances absent the granting of protection in the form of Sections 364(c)(1) and 364(d) super priority claims and first priority security interests as requested herein.

33.     In the instant case, the DIP Lender is seeking, as security for making post-petition advances under the DIP Priming Loan, a first priority lien, to the extent of all such post-petition

advances, upon the DIP Collateral pursuant to Section 364(d) of the Bankruptcy Code, and a super priority claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

34.     Importantly, the liens to be granted to the DIP Lender shall neither constitute a lien nor encumber proceeds from recoveries based upon estate causes of action pursuant to Sections 542 through 553 of the Code.

35.     As set forth above, the Debtor made substantial efforts to secure alternative post-petition financing on an unsecured, junior secured and/or or other less stringent basis and has been unable to obtain any lender willing to make such advances on more favorable terms than proposed herein. In light of all of the foregoing, the Debtor respectfully submits that obtaining the badly needed DIP Priming Loan under the terms of the DIP Commitment Letter is both necessary and in the best interests of the Debtor as well as all of the Debtor's creditors and parties in interest.

**I.     The Debtor Should Be Authorized to Obtain Post-Petition Financing on a Senior Secured and Superpriority Basis**

36.     The Debtor meets the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain post-petition financing and, in return, to grant superpriority administrative status and liens on its property. Specifically, section 364(c) of the Bankruptcy Code provides that the court may approve financing, "with priority over any or all administrative expenses. . .." 11 U.S.C. § 364(c). Further, section 364(d) of the Bankruptcy Code provides that priming liens may be incurred to support post-petition financing if the debtor is "unable to obtain such credit otherwise" and the primed lienholders are adequately protected. 11 U.S.C. § 364(d).

37.     Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant considerable deference to a debtor's exercise of its business judgment when evaluating their requests to incur post-petition credit. See, e.g., In re Latam Airlines Grp. S.A., 2020 WL 5506407 at *27 (Bankr. S.D.N.Y. Sept. 10, 2020)

12

("Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (deferring to a debtor's "reasonable business judgment. . . so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in interest").

38.    In determining whether the Debtor has exercised sound business judgment in deciding to enter into the DIP Priming Loan, this Court may appropriately take into consideration non-economic benefits to the Debtor offered by a proposed post-petition facility. For example, in In re ION Media Networks, Inc., 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009), the Bankruptcy Court for the Southern District of New York explained that "noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization" may be properly considered by debtors when selecting post-petition financing, because the "business decision to obtain credit from a particular lender is almost never based purely on economic terms" due to the importance of those terms. Id.

39.    Here, given all the facts and circumstances present in this Chapter 11 Case, the Debtor has satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Priming Loan. The Debtor exercised proper business judgment in securing the DIP Priming Loan on terms that are fair and reasonable and the best available to it under the circumstances and in the current market. Moreover, given the circumstances described above, the Debtor could not obtain credit on junior secured or unsecured basis or without the limited priming contemplated by the DIP Priming Order.

40.     For all the reasons discussed further below, the Debtor respectfully submits that the Court should grant the Debtor's request to enter into the DIP Priming Loan pursuant to sections 364(c) and (d) of the Bankruptcy Code.

**II.     The Debtor Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Priming Loan**

41.     Based on the facts and circumstances of this Chapter 11 Case, the DIP Priming Loan represents a proper exercise of the Debtor's business judgment. As noted above, bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including decisions about whether and how to borrow money. See, e.g., In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity") (citing Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)); In re Garrett Motion Inc., No. 20-12212 (Bankr. S.D.N.Y. October 23, 2020) (approving post-petition financing as "a sound and prudent exercise of the Debtors' business judgment"); In re Metaldyne Corp., 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009) (noting "decisions in [the Southern District of New York] emphasizing that [bankruptcy courts] should not substitute [their] business judgment for that of the Debtors'") (citations omitted), aff'd 421 B.R. 620 (S.D.N.Y. 2009); In re Ames Dep't Stores, Inc., 115 B.R. at 40 ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the

court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank. N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

42.    Specifically, when evaluating whether a debtor's decision to obtain post-petition financing was an exercise of sound business judgment, courts need only "examine whether a reasonable business person would make a similar decision under similar circumstances." In re Dura Auto. Sys., Inc., 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (quoting In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006)). When evaluating whether a debtor's decision to enter into post-petition financing was an exercise of sound business judgment, bankruptcy courts consider the terms of the financing in light of the debtor's circumstances and the market for financing more generally. See In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen McLean Oil Co., Inc.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re Curlew Valley Assoc., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." Id. at 513-14 (footnotes omitted).

43.    Prevailing market conditions are also highly relevant to a court's evaluation of a debtor's business judgment regarding their DIP financing. See Hr'g Tr. at 734 35:24, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable"

as in the past). Accordingly, the Debtor submits that the proposed DIP Priming Loan should be approved as a sound exercise of their business judgment.

44.     Developers generally are facing various challenges related to inflation and macroeconomic headwinds. Despite this economic environment, the Debtor has successfully negotiated financing that provides ample liquidity, attractive pricing, flexible budget covenants, and a path to reorganization which will allow the Debtor sufficient funds and time to complete and sell the Penthouse Units and to sell the Apartment Units, as well as to pay condo charges, professional fees, and real estate and other taxes. The amounts to be made available comport with the construction timeline and the requirements of the AIA. The Debtor has exercised sound business judgment in determining that a post-petition loan to complete the Penthouse Units is both necessary and appropriate and has satisfied the legal prerequisites to borrow under the DIP Priming Loan. The terms of the DIP Priming Loan are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to enter into the DIP Priming Loan and borrow funds from the DIP Lender on the terms set forth in the DIP Commitment Letter, with the total DIP Priming Loan to be secured with a first priority mortgage on the DIP Collateral. Without the DIP Priming Loan, the Debtor will be unable to proceed in this case with the completion and preservation of the Property. The Debtor has exercised its best judgment in negotiating the DIP Priming Loan that is presently before the Court.

### III.     The Debtor Has Meet the Conditions Necessary Under Sections 364(c) and (d)(1) to <u>Obtain Postpetition Financing on a Senior Secured and Superpriority Basis</u>.

45.     The Debtor proposes to obtain financing under the DIP Priming Loan by providing superpriority claims and liens pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code. The Debtor proposes to provide the DIP Lender with liens on and security interests in the DIP Collateral, including priming liens on certain of the Prepetition Collateral.

46.     In evaluating proposed post-petition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts act in their "informed discretion." In re Ames Dep't Stores, 115 B.R. at 37. Courts perform a qualitative analysis and consider factors including whether (a) the debtor made a reasonable effort to find financing with better terms, (b) the financing is necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate. In re Republic Airways Holdings Inc., 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016).

**IV.     The Debtor Is Unable to Obtain Financing on More Favorable Terms Than the DIP Facility.**

47.     Debtors need to demonstrate that they made a reasonable effort to find alternative financing before a bankruptcy court will order superpriority liens. In re Latam Airlines Grp. S.A., 2020 WL 5506407, at *26 (Bankr. S.D.N.Y. Sept. 10, 2020). But, the Bankruptcy Code "imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable." Id. (citing Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986)); In re Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584−85 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); In re Ames Dep't Stores, Inc., 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain superior terms after discussing possible post-petition financing with four lenders); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

48.     Moreover, when only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

49.     Here, the Debtor does not believe that comparable alternative sources of financing are reasonably available on similar pricing given the realities imposed by the Debtor's existing capital. The Debtor conducted extensive, arm's-length negotiations with the DIP Lender regarding the terms of the DIP Facility. Through these negotiations, the Debtor improved the economic and other terms of the DIP Priming Loan, which is the best financing proposal reasonably available under the circumstances.

50.     As will be shown at the hearing, a facility of the type needed in this case could not have been obtained on an unsecured basis or on a secured basis without the imposition of a priming lien. Alternative sources of proposed DIP financing for the Debtor are extremely limited. None of the alternative potential sources of post-petition financing proposed a facility that would meet the Debtor's requirements or that were on better pricing terms. Moreover, most financing required priming liens on all of the Prepetition Collateral. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986).

51.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c) and (d). Id.; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989). The Debtor submits that due to its current capital structure, that alternative credit on more favorable terms is unavailable to the Debtor.

52.     Further, the Property, which is the Debtor's only asset, is currently worth approximately $57.2 million. *See* Appraisals attached as **Exhibits D-1** and **D-2**. Palm Avenue, the Debtor's only secured creditor, holds a claim in the approximate amount of $65 million (which claim will purportedly increase with the calculation of default interest).[2] However, the Debtor projects that, with the infusion of the DIP Priming Loan of $22,000,000, which will enable to the Penthouses to be fully built-out, the Property's value will ultimately increase by approximately $42.4 million, for a total aggregate value of $101.6 million (see **Exhibit D-1** at p. 3).

53.     The DIP Priming Loan will therefore result in a creation of an additional equity cushion to Palm Avenue, while also retaining important liens, thereby satisfying the requirements of Section 364(d) as discussed below.

54.     In sum, the DIP Priming Loan represents the Debtor's best available postpetition financing option.

**V.     The Terms of the DIP Priming Loan Are Fair, Reasonable, and Adequate under the Circumstances.**

55.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. See In re Farmland Indus., Inc., 294 B.R. at 886; see also In re Ellingsen MacLean Oil Co., 65 B.R. at 365. The appropriateness of a proposed financing facility should also be considered in light of current market conditions. See In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009), Hr'g Tr. 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of the DIP] reasonable here and now."). Here, the terms of the DIP Priming Loan are fair, appropriate, reasonable, adequate under the circumstances, and in the best interests of the Debtor, its estate, and its creditors.

---

[2]     As noted above, the Debtor disputes the amount claimed to be outstanding by Palm Avenue.

56.     As noted above, the terms of the DIP Priming Loan were actively negotiated by the Debtor. Under the current circumstances, the pricing, fees, and other economics provided for in the DIP Priming Loan, taken as a whole, are reasonable and in the Debtor's best interests, and present the best terms available.

57.     No party in interest can seriously contend that the Debtor does not need immediate access to funds to complete the Penthouse Units and sell the Apartment Units. The Debtor has no funds, no income. Accordingly, access to credit is necessary to meet the needs associated with preserving and improving the Property. Access to sufficient credit is therefore critical to the Debtor. In the absence of immediate access to credit, the Debtor will not be able to effectively prepare the units in the Property for sale. The inability of the Debtor to meet these obligations may negatively impact the results of the Chapter 11 Case.

58.     Moreover, the amounts to be provided under the DIP Priming Loan comport with the amounts needed pursuant to the AIA to complete the Penthouse Units, pay professionals, condo charges, and taxes and other charges, and will allow for work on the Penthouse Unites to be completed on the timeline and in accordance with the budget attached hereto.

59.     For these reasons, access to credit under the DIP Priming Loan is critical. The Debtor's need for access to the DIP Priming Loan therefore is immediate.

**VI.     The DIP Lender Should Be Deemed a Good Faith Lender Under Section 364(e).**

60.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that: The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section

of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal. 11 U.S.C. § 364(e).

61.    Here, the Debtor believes the DIP Priming Loan embodies the most favorable terms on which the Debtor could obtain postpetition financing. As described in the Goldwasser Declaration, the negotiations of the terms of the DIP Priming Loan with the DIP Lender were conducted at arms' length. Under the circumstances, the terms and conditions of the DIP Priming Loan are reasonable, and the proceeds of the DIP Priming Loan will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Priming Order and the DIP Commitment Letter and in accordance with the Budget. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lender is thus entitled to all of the protections afforded by that section.

62.    As demonstrated by the Appraisals (attached as **Exhibits D-1** and **D-2**), the Property, through the use of the proceeds of the DIP Priming Loan, is expected to increase in value by approximately $42.4 million, for a total aggregate value of $101.6 million, whereas the DIP Priming Loan amount is a maximum of $22 million.

63.    In this instance, the DIP Priming Loan will enable the Debtor to complete the Penthouse Units in line with the AIA, sell the remaining Apartment Units, and pursue a consensual plan of reorganization, rather than face the prospect of an immediate, disorganized, and value-destructive liquidation.

64.    Since the completion of the Penthouse Units will increase the value of the Property far in excess of the amount of the DIP Priming Loan, no parties will be prejudiced by this

arrangement. The Debtor submits that proposed DIP Priming Loan reflects the exercise of sound and prudent business judgment. The Debtor would not have been able to obtain financing on an unsecured basis or otherwise, and the prospect of the DIP Lender's provision of financing provides the Debtor with assurance that it will be able to effectively and expeditiously reorganize in a manner that will be in the best interest of the Debtor's estate and its creditors. In the Debtor's business judgment, the DIP Priming Loan is the best financing option available under the circumstances in this case.

65.    The proposed terms of the DIP Priming Loan are fair, reasonable, and adequate in that these terms neither: (a) tilt the conduct of this case and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits. The purpose of the DIP Priming Loan is to enable the Debtor to meet ongoing expenses needed to complete and sell the Penthouse Units, prepare the Apartment Units at the Property for sale, and pay the other ongoing costs of the Chapter 11 case.

66.    The terms and conditions of the DIP Priming Loan are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Accordingly, the DIP Priming Loan should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of such agreement.

**VIII.    The Debtor Should Be Authorized to Pay the Fees and Premiums Required by the DIP Lender Under the DIP Facility.**

67.    In consideration for their commitment to provide the DIP Facility, the Debtor has agreed, subject to Court approval, to an origination fee of three percent (3%) of the amount of the DIP Priming Loan.

68.    In light of the substantial amount of capital that the DIP Lender has committed to provide to ensure an efficient and value-maximizing chapter 11 process, the Debtor believes that

the consideration being provided to the DIP Lender, taken as a whole, in exchange for providing such commitment, is reasonable under the circumstances and necessary to obtain the DIP Priming Loan. Accordingly, the Court should authorize the Debtor to pay the fees and premiums provided under the DIP Commitment Letter in connection with entering into the DIP Financing.

### IX. <u>The Automatic Stay Should Be Modified on a Limited Basis</u>.

69.     The DIP Priming Order contemplates modification of the automatic stay to permit the Debtor and the DIP Lender to implement and effectuate the terms and provisions of the DIP Priming Documents, the DIP Priming Order and the DIP Facility.

70.     The Debtor believes that these provisions were required for the Debtor to obtain the DIP Priming Loan as provided in the DIP Priming Order. Moreover, following the delivery of such notice, the DIP Lender may file a Stay Relief Motion seeking emergency relief from the automatic stay and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtor may use the proceeds of the DIP Priming Loan (to the extent drawn prior to the occurrence of Event of Default) to fund operations in accordance with the Budget.

71.     In the Debtor's business judgment, the stay modifications are reasonable and fair under the circumstances of this Chapter 11 Case.

### <u>NOTICE</u>

72.     Pursuant to Sections 102(1), 363(c), and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), notice of this Motion has been provided via regular mail to: (i) Palm Avenue, (ii) the Debtor's 20 largest unsecured creditors, (iii) the United States Trustee, and (iv) all parties having filed notices of appearance.

### <u>RESERVATION OF RIGHTS</u>

73.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; (g) a waiver or limitation of the Debtor's, or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtor's or any other party in interest's rights to subsequently dispute such claim.

**COMPLIANCE WITH RULE 4001-2 OF THE LOCAL BANKRUPTCY RULES**

74.     Rule 4001-2 of the SDNY Local Bankruptcy Rules requires that certain provisions contained in DIP Priming Loan be highlighted, and that the debtor must provide justification for the inclusion of such highlighted provision(s). The Debtor believes that certain provisions of Local

Rule 4001-2 are implicated, but that this Motion provides adequate disclosure regarding such provisions. The Debtor has set forth each of the sub-sections of Rule 4001-2 of the Local Rules and have detailed whether this Motion contains or contemplates provisions which would fall within the ambit thereof:

- <u>Local Rule 4001-2(a)(1)</u>: This Motion and the Budgets annexed hereto set forth the amount of DIP funding the Debtor seeks to use.

- <u>Local Rule 4001-2(a)(2)</u>: This Motion provides that the Debtor may use the DIP Priming Loan proceeds in accordance with the Budgets.

- <u>Local Rule 4001-2(a)(3)</u>: This Motion and the DIP Commitment Letter set out the fees to be incurred in connection with the making of the DIP Priming Loan.

- <u>Local Rule 4001-2(a)(4)</u>: This Motion describes the effects on existing liens of the granting of the DIP Priming Liens and DIP Superpriority Claims being provided to the DIP Lender.

- <u>Local Rule 4001-2(a)(5)</u>: The DIP Commitment Letter does not contain any carve-outs.

- <u>Local Rule 4001-2(a)(6)</u>: There are no cross-collateralization provisions, which elevate prepetition debt to administrative expense (or higher) status. This Motion provides that the DIP Lender shall receive a post-petition lien on the DIP Collateral to the extent of the advances made under the DIP Priming Loan only.

- <u>Local Rule 4001-2(a)(7)</u>: The Debtor is not seeking approval of any roll-up provisions.

- <u>Local Rule 4001-2(a)(8)</u>: The Debtor does not believe it is seeking approval of any provision that would limit the Court's power or discretion in a material way, or that would interfere with the exercise of the Debtor's fiduciary duties, or restrict the rights and powers, of the Debtor, or any committee or other fiduciary.

- <u>Local Rule 4001-2(a)(9)</u>: The Debtor is not seeking approval of any limitation on the DIP Lender's ability to fund certain activities of the Debtor or any committee appointed under sections 1102 or 1114 of the Bankruptcy Code except to the extent set forth in the Budgets.

- <u>Local Rule 4001-2(a)(10)</u>: The default provisions under the DIP Priming Loan are described in the Motion and the DIP Commitment Letter.

*[Remainder of Page Intentionally Left Blank]*

      **WHEREFORE**, the Debtor respectfully requests that the Court enter the DIP Priming

Order and grant the Debtor such other and further relief as is just and proper.

Dated:  White Plains, New York           **DAVIDOFF HUTCHER & CITRON LLP**
       February 4, 2025


                                   By:     /s/ Jonathan S. Pasternak
                                        Jonathan S. Pasternak
                                        120 Bloomingdale Road
                                        White Plains, New York 10605
                                        (914) 381-7400

                                        *Attorneys for the Debtor*


**Exhibits**

Exhibit A – DIP Commitment Letter and Budget
Exhibit B – AIA
Exhibit C – Construction Budget and Timeline
Exhibits D-1 and D-2 – Appraisals
Exhibit E – Proposed DIP Priming Order
Exhibit F – Goldwasser Declaration