## Exhibit D-1

Appraisal

Raising
appraising
standards™

# Real Estate Appraisal Report

**Two Community Facility Condominium Units Located At:**
**172 Madison Avenue**
**Units CU-A & CU-B**
**New York, NY 10016**

**Valuation Date:**
**July 3, 2024**

**Prepared For:**
**Mr. Yitzchak Tessler**
**Madison 33 Owner LLC**
**C/O Tessler Developments LLC**
**461 Park Avenue South, Second Floor**
**New York, NY 10016**

**Prepared By:**
**Republic Valuations**
**184 Park Avenue**
**Brooklyn, New York 11205**





Phone. 718.625.6707    info@republicvaluations.com
Fax. 718.625.6898    republicvaluations.com

July 16, 2024

Mr. Yitzchak Tessler
Madison 33 Owner LLC
C/O Tessler Developments LLC
461 Park Avenue South, Second Floor
New York, NY 10016

Re:    172 Madison Street, Units CU-A & CU-B
New York, NY 10016
Block: 863, Lots: 1101 & 1102
New York County

Dear Mr. Tessler,

As you requested, I have examined, inspected and appraised the above referenced units for the purpose of formulating an opinion of market value. It is my conclusion that the **As Is Market Value** of the **Leased Fee Interest** of the subject units, as of July 3, 2024, is:

## <u>TWELVE MILLION THREE HUNDRED THOUSAND DOLLARS</u>
## <u>$12,300,000</u>

The subject is located at the corner of Madison Avenue and East 33rd Street in the Midtown Manhattan section of New York, New York (Kings County). The subject units are identified in the Kings County Tax Maps as Block: 863, Lots: 1101 and 1102. The total land area of the site is 10,704± square feet.

The subject consists of a medical office condominium unit and retail condominium unit located on the cellar and first floor of a thirty-two-story mixed-use, condominium, building, known as the 172 Madison Avenue Condominium.

The building is comprised of 74 units; a retail unit and a medical office unit on the first and cellar floors and residential condominium units on the floors above. As per the ZD1, the total gross building area is 141,513± square feet above grade, plus additional square feet in the cellar and sub-cellar. The building was constructed in year 2017±. The building features additional amenities such as a gym, pool, pet spa and playroom in the cellar.

The subject of this appraisal is the medical office unit known as unit CU-A and the retail unit known as unit CU-B both units are located on the first floor with additional storage

space in the cellar. As per the condo declaration, the units contain a total of 4,361± square feet on the first floor and 2,039± square feet in the cellar. The units were informed to be tenant occupied and were found to be in good condition at time of inspection.

Following is a breakdown of the units.

| Unit Breakdown | |
|---|---:|
| **Unit CU-A** | |
| Cellar SF | 843 |
| First Floor SF | 2,754 |
| **Unit CU-B** | |
| Cellar SF | 1,196 |
| First Floor SF | 1,607 |
| **Total SF Above Grade** | **4,361** |

This appraisal does not take into consideration the possibility that the subject may be contaminated with asbestos, PCB's, or any other toxic, hazardous or radioactive substance. The value reported will be exclusive of the cost to discover, encapsulate, remove, or render harmless such improvements due to treatment. If you have any concern that such substances may be on the property, you should hire a qualified independent engineer or contractor to investigate the property. We cannot assume any responsibility for the discovery, analysis, or treatment of such substances either in the subject or surrounding properties.

This report is subject to the Limiting Conditions, Certification and Special Assumptions contained herein. It has been written in conformity with, and is subject to, the Requirements of the Code of Professional Ethics and the Standards of Professional Conduct of the Appraisal Institute. It is also understood that this report is prepared in compliance with FIRREA, USPAP, FDIC, OCC, and 12CFR.34 regulations.

**Extraordinary Assumption:**
- None

**Hypothetical Conditions:**
- None

The following report is a detailed summary of the pertinent data and analyses used in arriving at our conclusions.

Respectively submitted,

Victor Schlesinger
Certified General RE Appraiser
Cert.# 46000047078

# Table Of Contents

SUBJECT EXTERIOR PHOTOS ........................................................................ 7

    Street Scene Photos ................................................................. 8

    Subject Interior Photos ............................................................ 9

    Cellar and Mechanicals .......................................................... 14

UNDERLYING ASSUMPTIONS ................................................................... 16

LIMITING CONDITIONS ................................................................................ 18

APPRAISER'S CERTIFICATION ................................................................. 20

SUMMARY OF SALIENT FACTS ................................................................ 21

IMPORTANT DEFINITIONS .......................................................................... 24

EXECUTIVE SUMMARY ............................................................................... 26

SCOPE OF THE APPRAISAL ..................................................................... 28

LOCATION MAPS .......................................................................................... 29

    Aerial Maps ................................................................................ 32

    Flood Map .................................................................................. 33

    Census Map ............................................................................... 34

SUBJECT SITE LOCATION AND DESCRIPTION ................................... 35

LOCATION DESCRIPTION .......................................................................... 37

CITY & NEIGHBORHOOD ANALYSIS ...................................................... 47

ECONOMIC MARKET ................................................................................... 65

MARKET CONCLUSION ............................................................................... 68

# Table Of Contents

SALES HISTORY .............................................................................................. 69

SITE DESCRIPTION ........................................................................................ 70

IMPROVEMENT DESCRIPTION ...................................................................... 71

TAXES & ASSESSMENT ................................................................................. 72

ZONING .......................................................................................................... 74

HIGHEST AND BEST USE ............................................................................... 78

VALUATION PROCESS .................................................................................... 82

SALES COMPARISON APPROACH ................................................................. 84

THE INCOME CAPITALIZATION APPROACH ................................................. 100

    Subject Rent Roll ...................................................................................... 102

    Rental Comparables .................................................................................. 103

    Income and Expense Assumptions ........................................................... 104

    Rate Selection ........................................................................................... 107

    Direct Capitalization of Income ................................................................. 111

RECONCILIATION ........................................................................................... 112

INSURABLE VALUE ........................................................................................ 113

ADDENDUM .................................................................................................... 114

QUALIFICATIONS OF VICTOR SCHLESINGER ............................................. 134

## Subject Exterior Photos



Subject Property



Subject Property

**Street Scene Photos**



Madison Avenue



Madison Avenue

**Subject Interior Photos**



Unit CU-B Interior



Unit CU-B Interior



Unit CU-B Interior

**Subject Interior Photos**



Unit CU-B Interior



Bathroom



Unit CU-B Interior

**Subject Interior Photos**



Unit CU-A Interior



Unit CU-A Interior



Unit CU-A Interior

## Subject Interior Photos



Unit CU-A Interior



Bathroom



Unit CU-A Interior

**Subject Interior Photos**



Unit CU-A Interior



Unit CU-A Interior



Unit CU-A Interior

**Cellar and Mechanicals**







## Cellar and Mechanicals







## Underlying Assumptions

This appraisal report was prepared in accordance with the following underlying assumptions. It is to be understood that a client's request for, and acceptance of, this appraisal report constitutes the acceptance of these underlying assumptions.

◆ **Legal Matters:** The legal description used in this report is assumed to be correct, but it may not necessarily have been confirmed by a survey. No responsibility is assumed for legal descriptions, surveys or for easements, encroachments, rights of way, overlapping or other discrepancies that might be revealed thereby. Any sketches included in the report are only for the purpose of aiding the reader in visualizing the property and are not necessarily a result of a survey. Whenever surveys are provided, the appraiser or appraisers do not guarantee their accuracy.

No responsibility is assumed for an opinion of legal nature, such as to ownership of the subject or, the subsequent condition of title.

The appraiser assumes that the title to the subject is marketable; unless stated to the contrary, the subject is appraised as an unencumbered estate which is not used in violation of applicable and acceptable ordinances, statutes or other governmental regulations.

The appraiser assumes that the reader or user of this report has been provided with copies of available building plans and all leases and amendments, if any, encumbering the subject as well as any other existing documentation that may reveal important information about the subject. At no point is the appraiser responsible for discovering and providing any such documentation to the client. It is neither possible nor practical for the appraiser to validate with a high degree of accuracy all information and documentation that may be provided to him during the course of an assignment. However, in cases where discrepancies, inconsistencies, and inaccuracies are evident, the appraiser will draw conclusions in a logical manner as would reasonably be expected based on all the available information.

◆ **Unapparent Conditions:** The appraiser assumes that there are no hidden or unapparent conditions of the subject, subsoil or structures which would render it more or less valuable than otherwise comparable property. The appraiser is not an expert in determining the presence or absence of hazardous substances, which is defined for the purpose of this report; as all hazardous or toxic materials, waste, pollutants or contaminants (including, but not limited to, asbestos, PCB's, UFFI, or other raw materials or chemicals) used in construction or otherwise present in the property or on the site. The appraiser assumes no responsibility for the studies or analysis which would be required to conclude the presence or absence of such

## Underlying Assumptions

substances or for any loss arising as a result of the presence of such substances. The client is urged to retain an expert in this field, wherever circumstances deem if necessary. The value conclusions contained in this report are based on the assumption that the subject is not affected by any such substances.

\* Conditions are considered to be unapparent when: pertinent information is undisclosed or withheld, not readily or publicly available, or which otherwise does not become known in the normal course of the appraisal assignment.

♦ **Information and Data:** Information, estimates, and opinions furnished to the appraiser or appraisers and contained in the report, were obtained from sources considered to be reliable and believed to be true and correct. Whenever possible, information is verified by means of several sources. The sources of such information are cited wherever possible. However, no responsibility for the accuracy of such items is assumed by the appraiser or appraisers.

All mortgages, liens, encumbrances, and servitudes have been disregarded unless so specified within the body of the appraisal report. The subject is appraised as though under responsible ownership and competent management.

♦ **Zoning and Licenses:** It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconforming use has been stated, defined and considered in the valuation and subsequently discussed within the body of this report. It is assumed that the subject property complies with all applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined and considered in the valuation process. It is assumed that the information relating to the location of or existence of public utilities that has been obtained through inquiries from the appropriate utility authorities, or has been ascertained from visual evidence is correct. No warranty is made regarding the exact location or capacities of public utility systems. It is also assumed that all licenses, certificates, consents or other legislative or administrative authorities from local, state or national governmental or private entities or organizations have been, or can be, obtained or renewed for any use on which the value estimate contained in the appraisal report is based.

# Limiting Conditions

This appraisal report was prepared in accordance with the following limiting conditions. It is to be understood that a client's request for, and acceptance of, this appraisal report constitutes the acceptance of these limiting conditions.

- The appraiser will <u>not</u> be required to give testimony or appear in court as a result of preparing the appraisal with reference to the subject in question, <u>unless</u> prior arrangements have been made and agreed upon to that effect.

- <u>Possession of this report does not carry with it the right of publication.</u> Out-of-context quotations or partial reprinting of this appraisal report <u>is not</u> authorized. Further, neither all nor any part of this appraisal report shall be disseminated to the general public by the use of media for public communication without the prior written consent of the appraiser signing this appraisal report.

- Disclosure of the contents of this report is governed by the By-Laws and Regulations of The Appraisal Institute. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser or appraisers or the firm with which the appraiser (s) is associated, or any reference to The Appraisal Institute or to the appraiser's designations) shall be disseminated to the public through advertising media, public relations media, news media, sales media or any other public means of communication without the prior written consent and approval of the respective appraiser or appraisers.

- The distribution of the total valuation in this report, between land and improvements, is applicable only as it is utilized in this appraisal. The land value, or the separate value of the improvements, must not be used in conjunction with any other appraisal or estimate and is invalid if so used.

  An appraisal related to an estate in land that is less than the whole Fee Simple Estate applies only to the fractional interest or interests involved. The value of this fractional interest plus the value of all other fractional interests may or may not equal the value of the entire Fee Simple Estate considered as a whole.

  The appraisal report related to a geographical portion of a larger parcel is applied only to such geographical portion and should not be considered as applying with equal validity to other portions of the larger parcel or tract as a whole. The value for such geographical portions plus the value of all other geographical portions may or may not equal the value of the entire parcel or tract considered as a whole.

- The forecasts, projections, or operating estimates contained herein are based upon current market conditions, anticipated short-term supply and demand factors,

## Limiting Conditions

and a continued stable economy. These forecasts are, therefore, subject to change as conditions change.

- The plans, specifications, and representations referred to herein are an integral part of the appraisal report when new construction, additions, renovations, or remodeling is either evident or proposed. As such the appraisal is subject to any proposed improvements or additions being completed as set forth in the plans, specifications, and representations referred to in the report, and all work being performed in a good and workmanlike manner. The appraisal is further subject to the proposed improvements or additions being constructed in accordance with the regulations of the local, county, and state authorities.

- No environmental or concurrency impact studies were either requested or made in conjunction with this appraisal report. The appraiser, thereby, reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental or concurrency impact studies, research or investigation subsequent to the completion of this appraisal report.

- The Americans with Disabilities Act ("ADA") became effective January 26, 1992. The appraiser has not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the subject. Since the appraiser is not considered an expert with these issues, possible noncompliance with the requirements of ADA and its impact on the value of the subject has not been considered.

This appraisal report complies with the requirements set forth in title XI CFR part 225.61 et seq; of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989, commonly known as "FIRREA". The appraisal also conforms to the Uniform Standards of Professional Appraisal Practice ("USPAP") and discloses any steps taken that were necessary or appropriate to comply with the competency provision of USPAP, and that this appraisal is not based on a requested minimum valuation, a specific valuation or the approval of a loan.

## Appraiser's Certification

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the units that are the subject of this report and no personal interest or bias with respect to the parties involved.
- I have not performed appraisal services, as an appraiser or in any other capacity, regarding the units that are the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- I have no bias with respect to the units that are the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Practice
- I have made a personal inspection of the subject that is the subject of this report.
- No one provided significant real property appraisal assistance to the person signing this certification.
- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- As of the date of this report, I have completed the Standards and Ethics Education Requirements for Practicing Affiliates of the Appraisal Institute.
- As of the date of this report, I have completed the continuing education program for Practicing Affiliates of the Appraisal Institute.

Victor Schlesinger
Certified General RE Appraiser
Cert.# 46000047078

# Summary of Salient Facts

| | |
|---|---|
| Location: | 172 Madison Avenue<br>New York, NY 10016<br>New York County |
| Unit Identification: | Block: 863, Lots: 1101 and 1102 |
| Property Type: | Condominiums - Mixed Residential &<br>Commercial Building (RM) |
| Owner: | Madison 33 Owner LLC |
| Property Rights Appraised: | Leased Fee |

## Site Description

| | |
|---|---|
| Lot Size: | 10,704± square feet |
| Zoning: | C5-2 - Commercial |
| Real Estate Taxes 2024: | Lot 1101: $90,527<br>Lot 1101: $58,197<br>Total Taxes: $148,724.52 |
| Topography: | Level and at grade with surrounding roadways. |
| Utilities: | Water, sewer, gas, electric and phone service are available and connected to the units. |
| Utility: | Average |

**Summary of Salient Facts**

### Improvements

The subject consists of a medical office and retail unit located on the cellar and first floor of a thirty-two-story mixed-use, condominium, building, known as the 172 Madison Avenue Condominium.

The building is comprised of 74 units; a retail unit and a medical office unit on the first and cellar floors and residential condominium units on the floors above. As per the ZD1, the total gross building area is 141,513± square feet above grade, plus additional square feet in the cellar and subject-cellar. The building was constructed in year 2017±. The building features additional amenities such as a gym, pool, pet spa and playroom in the cellar.

The subject of this appraisal is the medical office unit known as unit CU-A and the retail unit known as unit CU-B both units are located on the first floor with additional storage space in the cellar. As per the condo declaration, the units contain a total of 4,361± square feet on the first floor and 2,039± square feet in the cellar. The units were informed to be tenant occupied and were found to be in good condition at time of inspection.

Following is a breakdown of the units.

| Unit Breakdown | |
|---|---:|
| **Unit CU-A** | |
| Cellar SF | 843 |
| First Floor SF | 2,754 |
| **Unit CU-B** | |
| Cellar SF | 1,196 |
| First Floor SF | 1,607 |
| **Total SF Above Grade** | **4,361** |

## Summary of Salient Facts

**Conclusions**

| | |
|---|---|
| Highest and Best Use "As Vacant": | residential/commercial/ community facility development |
| Highest and Best Use "As Improved": | as is, existing |
| Income Approach: | Not Applied |
| Sales Comparison Approach: | $12,000,000 |
| Income Approach: | $12,300,000 |
| **As Is Market Value Conclusion:** | **$12,300,000** |
| Date of Value/Inspection: | July 3, 2024 |
| Date of Report: | July 16, 2024 |

**Extraordinary Assumption:**
- None

**Hypothetical Conditions:**
- None

## Important Definitions

***Market Value***................................................................................................................

"Market value means the most probable price which a property should bring in a competitive and open market under all condition's requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."[1]

***Fee Simple Estate***.........................................................................................................

"Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat"[2]

***Leased Fee Interest***.......................................................................................................

"The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires."[3]

***Insurable Value***.............................................................................................................

"A type of value for insurance purposes."[4]

---

[1] 12 CFR (Code of Federal Regulations) Section 34.42(h), January 1, 2020, p. 618-619
[2] The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022), p. 73.
[3] The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022), p. 105.
[4] The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022), p. 323.

## Important Definitions

### Condominium...............................................................................................

"An attached, detached, or stacked unit within or attached to a structure with common areas that are held as tenants in common (an undivided interest) with other owners in the project. The units can be residential, commercial, industrial, or parking spaces or boat docks. These units are commonly defined by state laws in their locations. Because units can be stacked on top of other units, these units can be defined both vertically and horizontally." [5]

### Condominium Ownership..................................................................................

A form of ownership of separate units or portions of buildings, parking lots, boat docks, or other property with multiple units and multiple owners that provides for formal filing and recording of a divided interest in real estate. [6]

### Extraordinary Assumption...............................................................................

"An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis."[7]

### Hypothetical Condition...................................................................................

"a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."[8]

---

[5] The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022), p. 37.
[6] The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022), p. 37.
[7] Uniform Standards of Professional Appraisal Practice, 2020-2021 ed. (Washington DC: Appraisal Standards Board of The Appraisal Foundation, 2020), p. 4.
[8] Uniform Standards of Professional Appraisal Practice, 2020-2021 ed. (Washington DC: Appraisal Standards Board of The Appraisal Foundation, 2020), p. 4.

# Executive Summary

## Purpose Of the Appraisal

This appraisal has been performed for the purpose of estimating the as is market value for the subject unit, as of July 3, 2024. This report reflects the probable market value under typical selling conditions prevalent as of the date of value.

## Intended Use & User

The intended use of this appraisal is to estimate the as Is market value for the subject unit, for bankruptcy court purposes.

The client and intended user of this report is Mr. Yitzchak Tessler, C/O Tessler developments LLC. No additional intended users are identified by the appraiser.

## Identification Of the Subject

The subject is located on the corner of Madison Avenue and East 33rd Street in the Midtown Manhattan section of New York, New York (Kings County). The subject units are identified in the Kings County Tax Maps as Block: 863, Lots: 1101 and 1102. The subject units are further identified within the body of this appraisal report.

## Property Rights Appraised

This valuation estimates the **Leased Fee Interest**. No estimate of business value is included within the scope of this appraisal.

**Executive Summary**

## Estimate Of Exposure Time

**Exposure time is defined as:**

1. *The time a property remains on the market.*
2. *An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. (USPAP, 2020-2021 ed.)* [9]

Based on discussions with brokers active in the local market, exposure time for properties similar to the subject has historically approximated six to eight months depending on the size, location, and condition of the property. Exposure time for the subject is estimated to be eight months.

## Estimate Of Marketing Time

**Marketing time is defined as:**

*"The time it takes an interest in real property to sell on the market subsequent to the date of an appraisal."* [10]

Based on discussions with brokers active in the local market, marketing time for properties similar to the subject has historically been four to twelve months Marketing time for the subject is estimated to be four months.

---

[9] The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022), p. 67-68.
[10] The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022), p. 116.

## Scope of the Appraisal

The scope of the appraisal encompasses the necessary research and analysis to prepare the report in accordance with the intended use, the Standards of Professional Practice of The Appraisal Institute, and the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation.  The steps typically involved in the valuation process are as follows:

1.   The subject is physically inspected as of the date indicated in the Summary of Salient Facts section of this report.  Interior photographs included in this report are taken on the date of inspection.  Exterior and area photographs are taken on or after the date of inspection.

2.   Regional, county, municipal and neighborhood data is based on information gathered from various sources including state agencies, newspaper publications, trade publications supplied by commercial sources, multiple listing systems, market participants (i.e., buyers - sellers - brokers) as well as the appraiser's physical inspection and analysis of the area.

3.   Data relating to the subject is based on the appraiser's physical inspection of the improvements, as well as building plans and or site information supplied by municipal agencies or the owner, measurements made at the inspection, and information extracted from the deed as well as other similar documentation.  In cases where the improvements are proposed information is based on available blueprints or other similar documentation.

4.   In estimating The Highest and Best Use for the subject, an analysis is made of the data compiled in the previously noted steps.  And; a study of the subject market area is conducted to determine which aspects of The Highest and Best Use are applicable to the subject.

5.   In developing applicable approaches to value, the appraiser analyzes market data relevant to the subject.  Sales of land, improved properties and leases similar to the subject are researched from a variety of sources which may include SR1A records, deed transactions reported by commercial information services, multiple listing services, interviews with municipal officials, realtors, other appraisers, and buyers and sellers.  Whenever possible, information is verified by more than one source in order to guarantee its accuracy.  The search for data begins in the subject community and is expanded into surrounding communities until sufficient data is collected.

6.   Only after assembling and analyzing the data defined in the Scope of the Appraisal, can the appraiser establish a final estimate of Market Value.

## Location Maps



**Subject**
172 Madison Avenue
New York, NY 10016

**Location Maps**



# Location Maps



**Aerial Maps**





## Flood Map



**Flood Map**

The subject property is in a Zone X, which is an area of minimal flood risk outside the 500-year flood.

## Census Map



Matched Address: 172 Madison Ave. New York, New York, 10016
MSA: 35614 - NEW YORK-JERSEY CITY-WHITE PLAINS, NY-NJ || State: 36 - NEW YORK || County: 061 - NEW YORK COUNTY || Tract Code: 0074.00

Selected Tract
MSA: || State: || County: || Tract Code:

## Subject Site Location and Description

| Street, Access and Frontage | |
|---|---|
| **Street Name** | **Madison Avenue** |
| Frontage Feet | 84.06± |
| Street Type | Residential and Commercial |
| Street Width | 75 Feet |
| Direction of Traffic | One Way |
| Lanes | Two |
| **Street Name** | **East 33rd Street** |
| Frontage Feet | 120± |
| Street Type | Residential and Commercial |
| Street Width | 60 Feet |
| Direction of Traffic | One Way |
| Lanes | One |
| Lot Influence | Corner |
| Traffic Lights | Yes |
| Curbs | Yes |
| Sidewalks | Yes |
| Street Parking | Yes |
| Bike Lane | No |
| Traffic Levels | Average |
| External Obsolescence | No |
| External Obsolescence Explanation | None |

| Site Position | |
|---|---|
| Surrounding Properties | Residential and Mixed-Use |

| Strengths | |
|---|---|
| **Site Located in the Vicinity of** | |
| Transportation | Yes |
| Shopping areas | Yes |
| Eateries | Yes |
| Schools | Yes |
| Health Centers, Hospitals | Yes |
| Public Parks | Yes |
| House of Worship | Yes |

| Additional Strengths |
|---|
| The subject is located on Madison Avenue; a busy street. |

| Additional Factor |
|---|
| The subject is located in close proximity to the Empire State Building. |

## Subject Site Location and Description

The subject is located on the corner of Madison Avenue and East 33rd Street in the Midtown Manhattan section of New York, New York (Kings County). The subject units are identified in the Kings County Tax Maps as Block: 863, Lots: 1101 and 1102.

The subject is located in a prime location; on Madison Avenue. The subject is located in close proximity to East 34th Street, and the Empire State Building.

Madison Avenue is a north-south avenue in the borough of Manhattan in New York City, United States, that carries northbound one-way traffic. It runs from Madison Square (at 23rd Street) to meet the southbound Harlem River Drive at 142nd Street, passing through Midtown, the Upper East Side (including Carnegie Hill), East Harlem, and Harlem. It is named after and arises from Madison Square, which is itself named after James Madison, the fourth President of the United States.

Conclusion:
The subject is located in a well-established, area and is located in the vicinity of nearby shopping areas, eateries, schools, health clinics and public parks.

## Location Description

**Subject Location: Midtown Manhattan, New York, NY**

**Manhattan** is the most densely populated and geographically smallest of the five boroughs of New York City. The borough is also coextensive with New York County, one of the original counties of the U.S. state of New York. Located near the southern tip of the State of New York, Manhattan is based in the Eastern Time Zone and constitutes both the geographical and demographic center of the Northeast megalopolis and the urban core of the New York metropolitan area, the largest metropolitan area in the world by urban landmass. Over 58 million people live within 250 miles of Manhattan, which serves as New York City's economic and administrative center, cultural identifier, center of glamor, and the city's historical birthplace. Residents of the outer boroughs of New York City often refer to Manhattan as "the City".

Manhattan has been described as the cultural, financial, media, and entertainment capital of the world, and hosts the United Nations headquarters. Manhattan also serves as the headquarters of the global art market, with numerous art galleries and auction houses collectively hosting half of the world's art auctions.

Situated on one of the world's largest natural harbors, the borough consists mostly of Manhattan Island, bounded by the Hudson, East, and Harlem rivers along with several small adjacent islands, including Roosevelt, U Thant, and Randalls and Wards Islands. The Borough of Manhattan also includes the small neighborhood of Marble Hill on the U.S. mainland, which was separated from Manhattan Island by construction of the Harlem Ship Canal and was later connected using landfill to the Bronx. Manhattan Island is divided into three informally bounded components, each cutting across the borough's long axis: Lower, Midtown, and Upper Manhattan.

Anchored by Wall Street in the Financial District of Lower Manhattan, New York City has been called both the most economically powerful city and the leading financial and fintech center of the world, and Manhattan is home to the world's two largest stock exchanges by total market capitalization, the New York Stock Exchange and Nasdaq. Many multinational media conglomerates are based in Manhattan, and the borough has been the setting for numerous books, films, and television shows. Driven by Manhattan, New York's real estate market is the most expensive in the world, with the value of Manhattan Island, including real estate, estimated to exceed US$4 trillion in 2021. Median residential property sale prices in Manhattan approximated US$1,600 per square foot ($17,000/m$^2$)

**Location Description**

as of 2018, with Fifth Avenue in Midtown Manhattan commanding the highest retail rents in the world, at US$3,000 per square foot ($32,000/m²) per year in 2017. In 2022, the average monthly apartment rent in Manhattan climbed over US$5,000 for the first time.

New York County is the smallest county by land area in the contiguous United States, as well as the most densely populated U.S. county. Manhattan is one of the most densely populated locations in the world, with a 2020 census population of 1,694,251 living in a land area of 22.83 square miles (59.13 km²), or 72,918 residents per square mile (28,154 residents/km²), higher than the density of any individual U.S. city. On business days, the influx of commuters increases this number to over 3.9 million, or more than 170,000 people per square mile (66,000 people/km²). Manhattan has the third-largest population of New York City's five boroughs, after Brooklyn and Queens, and is the smallest borough in terms of land area. If each borough were ranked as a city, Manhattan would rank as the sixth-most populous in the U.S.

Many districts and landmarks in Manhattan are well known, as New York City received a record 62.8 million tourists in 2017, and Manhattan hosts three of the world's 10 most-visited tourist attractions in 2013: Times Square, Central Park, and Grand Central Terminal. The Empire State Building has become the global standard of reference to describe the height and length of other structures. Penn Station in Midtown Manhattan is the busiest transportation hub in the Western Hemisphere. The borough hosts many prominent bridges, including the Brooklyn, Manhattan, Williamsburg, Queensboro, Triborough, and George Washington Bridges; tunnels such as the Holland and Lincoln Tunnels; skyscrapers including the Empire State Building, Chrysler Building, and One World Trade Center; and parks, such as Central Park. The City of New York was founded at the southern tip of Manhattan, and the borough houses New York City Hall, the seat of the city's government. Numerous colleges and universities are located in Manhattan, including Columbia University, New York University, Cornell Tech, Weill Cornell Medical College, and Rockefeller University, which have been ranked among the top 40 in the world. The Metropolitan Museum of Art is both the largest and most visited art museum in the United States and hosts the globally focused Met Gala haute couture fashion event annually. Governors Island in New York Harbor is planned to host a US$1 billion research and education center poised to make New York City the global leader in addressing the climate crisis.

<u>Demographics</u>

## Location Description

In 2020, 1,694,251 people lived in Manhattan. At the 2010 U.S. census, there were 1,585,873 people living in Manhattan, an increase of 3.2% since 2000. Since 2010, Manhattan's population was estimated by the U.S. Census Bureau to have increased 2.7% to 1,628,706 as of 2018, representing 19.5% of New York City's population of 8,336,817 and 8.4% of New York State's population of 19,745,289.

As of the 2020 census, the population density of New York County was 74,870.7 inhabitants per square mile (28,907.7/km$^2$), the highest population density of any county in the United States.

Manhattan is one of the highest-income places in the United States with a population greater than one million. As of 2012, Manhattan's cost of living was the highest in the United States. Manhattan is also the United States county with the highest per capita income, being the sole county, whose per capita income exceeded $100,000 in 2010. However, from 2011–2015 Census data of New York County, the per capita income was recorded in 2015 dollars as $64,993, with the median household income at $72,871, and poverty at 17.6%. In 2012, *The New York Times* reported that inequality was higher than in most developing countries, stating, "The wealthiest fifth of Manhattanites made more than 40 times what the lowest fifth reported, a widening gap (it was 38 times, the year before) surpassed by only a few developing countries".

Economy
Manhattan is the economic engine of New York City, with its 2.3 million workers in 2007 drawn from the entire New York metropolitan area accounting for almost two-thirds of all jobs in New York City. In the first quarter of 2014, the average weekly wage in Manhattan (New York County) was $2,749, representing the highest total among large counties in the United States. Manhattan's workforce is overwhelmingly focused on white collar professions, with manufacturing nearly extinct. Manhattan also has the highest per capita income of any county in the United States.

In 2010, Manhattan's daytime population was swelling to 3.94 million, with commuters adding a net 1.48 million people to the population, along with visitors, tourists, and commuting students. The commuter influx of 1.61 million workers coming into Manhattan was the largest of any county or city in the country, and was more than triple the 480,000 commuters who headed into second-ranked Washington, D.C.

**Location Description**

Manhattan's most important economic sector lies in its role as the headquarters for the U.S. financial industry, eponymously known as Wall Street. Manhattan is home to the New York Stock Exchange (NYSE), at 11 Wall Street in Lower Manhattan, and the Nasdaq, now located at 4 Times Square in Midtown Manhattan, representing the world's largest and second-largest stock exchanges, respectively, when measured both by overall share trading value and by total market capitalization of their listed companies in 2013. The NYSE American (formerly the American Stock Exchange, AMEX), New York Board of Trade, and the New York Mercantile Exchange (NYMEX) are also located downtown. Financial technology (fintech) and cryptocurrency have emerged as more recent constituents of the financial sector as well as the tech sector.

New York City is home to the most corporate headquarters of any city in the United States, the overwhelming majority based in Manhattan. Manhattan contained over 520 million square feet (48.3 million m²) of office space in 2022, making it the largest office market in the United States; while Midtown Manhattan, with over 400 million square feet (37.2 million m²) is the largest central business district in the world. New York City's role as the top global center for the advertising industry is eponymously reflected as "Madison Avenue".

Manhattan has driven New York's status as a top-tier global high technology hub. Silicon Alley, once a metonym for the sphere encompassing the metropolitan region's high technology industries, is no longer a relevant moniker as the city's tech environment has expanded dramatically both in location and in its scope. New York City's current tech sphere encompasses a universal array of applications involving artificial intelligence, the internet, new media, financial technology (fintech) and cryptocurrency, biotechnology, game design, and other fields within information technology that are supported by its entrepreneurship ecosystem and venture capital investments. As of 2014, New York City hosted 300,000 employees in the tech sector. In 2015, Silicon Alley generated over US$7.3 billion in venture capital investment, most based in Manhattan, as well as in Brooklyn, Queens, and elsewhere in the region. High technology startup companies and employment are growing in Manhattan and across New York City, bolstered by the city's emergence as a global node of creativity and entrepreneurship, social tolerance, and environmental sustainability, as well as New York's position as the leading Internet hub and telecommunications center in North America, including its vicinity to several transatlantic fiber optic trunk lines, the city's intellectual capital, and its extensive outdoor wireless connectivity. Verizon Communications, headquartered at 140 West Street in

## Location Description

Lower Manhattan, was at the final stages in 2014 of completing a US$3 billion fiberoptic telecommunications upgrade throughout New York City. As of October 2014, New York City hosted 300,000 employees in the tech sector, with a significant proportion in Manhattan. The technology sector has been expanding across Manhattan since 2010.

The biotechnology sector is also growing in Manhattan based upon the city's strength in academic scientific research and public and commercial financial support. By mid-2014, Accelerator, a biotech investment firm, had raised more than US$30 million from investors, including Eli Lilly and Company, Pfizer, and Johnson & Johnson, for initial funding to create biotechnology startups at the Alexandria Center for Life Science, which encompasses more than 700,000 square feet (65,000 m²) on East 29th Street and promotes collaboration among scientists and entrepreneurs at the center and with nearby academic, medical, and research institutions. The New York City Economic Development Corporation's Early-Stage Life Sciences Funding Initiative and venture capital partners, including Celgene, General Electric Ventures, and Eli Lilly, committed a minimum of US$100 million to help launch 15 to 20 ventures in life sciences and biotechnology.

<u>Real Estate</u>
Real estate is a major force in Manhattan's economy. Manhattan has perennially been home to some of the nation's, as well as the world's, most valuable real estate, including the Time Warner Center, which had the highest-listed market value in the city in 2006 at US$1.1 billion, to be subsequently surpassed in October 2014 by the Waldorf Astoria New York, which became the most expensive hotel ever sold after being purchased by the Anbang Insurance Group, based in China, for US$1.95 billion. When 450 Park Avenue was sold on July 2, 2007, for US$510 million, about US$1,589 per square foot (US$17,104/m²), it broke the barely month-old record for an American office building of US$1,476 per square foot (US$15,887/m²) based on the sale of 660 Madison Avenue. In 2014, Manhattan was home to six of the top ten zip codes in the United States by median housing price. In 2019, the most expensive home sale ever in the United States occurred in Manhattan, at a selling price of US$238 million, for a 24,000-square-foot (2,200 m²) penthouse apartment overlooking Central Park, while Central Park Tower, topped out at 1,550 feet (472 m) in 2019, is the world's tallest residential building, followed globally in height by 111 West 57th Street and 432 Park Avenue, both also located in Midtown Manhattan.

## Location Description

Manhattan had approximately 520 million square feet (48.1 million m²) of office space in 2013, making it the largest office market in the United States. Midtown Manhattan is the largest central business district in the nation based on office space, while Lower Manhattan is the third-largest (after Chicago's Loop).

As of the fourth quarter of 2021, the median value of homes in Manhattan was $1,306,208. It ranked second among US counties for highest median home value at the time, second to Nantucket.

**Midtown Manhattan** is the central portion of the New York City borough of Manhattan. Midtown is home to some of the city's most prominent buildings, including the Empire State Building, the Chrysler Building, the Hudson Yards Redevelopment Project, the headquarters of the United Nations, Grand Central Terminal, and Rockefeller Center, as well as tourist destinations such as Broadway and Times Square.

Midtown Manhattan is the largest central business district in the world and ranks among the most expensive pieces of real estate; Fifth Avenue in Midtown Manhattan commands the world's highest retail rents, with average annual rents at US$3,000 per square foot ($32,000/m2) in 2017. However, due to the high price of retail spaces in Midtown, there are also many vacant storefronts in the neighborhood. Midtown is the country's largest commercial, entertainment, and media center, and also a growing financial center.

The majority of New York City's skyscrapers, including its tallest hotels and apartment towers, are in Midtown. The area hosts commuters and residents working in its offices, hotels, and retail establishments, tourists and students. Times Square, the brightly illuminated hub of the Broadway Theater District, is a major center of the world's entertainment industry. Sixth Avenue also has the headquarters of three of the four major U.S. television networks.

Midtown is part of Manhattan Community District 5. It is patrolled by the 14th and 18th precincts of the New York City Police Department."

Location
Geographically, the northern boundary of Midtown Manhattan is commonly defined to be 59th Street; its southern boundary is less clear, and variously taken to be 34th Street, 23rd Street, or even 14th Street. Midtown spans the entire island of Manhattan along an

**Location Description**

east–west axis, bounded by the East River on its east and the Hudson River to its west. *The Encyclopedia of New York City* defines Midtown as extending from 34th Street to 59th Street and from 3rd Avenue to 8th Avenue.

Neighborhoods
Further information: List of Manhattan neighborhoods
In addition to its central business district, Midtown Manhattan encompasses many neighborhoods, including Hell's Kitchen and Chelsea on the West Side, and Murray Hill, Kips Bay, Turtle Bay, and Gramercy Park on the East Side. It is sometimes broken into "Midtown East" and "Midtown West", or north and south as in the New York City Police Department's Midtown North and Midtown South precincts.

Transportation
Pennsylvania Station and Grand Central Terminal are the two major railroad stations located in Midtown Manhattan. Penn Station serves Amtrak, NJ Transit, and the Long Island Rail Road (LIRR), while Grand Central serves the Metro-North Railroad and will serve the LIRR in the future. Penn Station is considered to be the busiest transportation hub in the Western Hemisphere, servicing around 650,000 people per day.

The Port Authority Bus Terminal is located at Eighth Avenue and 41st Street at the western edge of Midtown. The terminal is the largest in the United States and busiest in the world by volume of traffic, serving more than 65 million people per year.

The New York City Subway and MTA Regional Bus Operations each operate several routes that go through Midtown. Additionally, the PATH train to New Jersey terminates at 33rd Street and Sixth Avenue in Midtown.

Traffic congestion is common, especially for crosstown traffic. In 2011, a new system of traffic light control, known as "Midtown in Motion" was announced, with the aim of reducing traffic congestion. Approximately 750,000 vehicles enter Midtown Manhattan on a fall business day. According to the 2011 Traffic Data Report for New York State, 777,527 vehicles a day went through select toll facilities into Manhattan.

**Location Description**

# Manhattan Community District 5



See MN 5's profile online at communityprofiles.planning.nyc.gov

**Neighborhoods[1]:** Flatiron, Gramercy Park, Herald Square, Midtown, Midtown South, Murray Hill, Times Square, Union Square



| POPULATION & DENSITY | | |
|---|---|---|
| 2000[2] | 2010[3] | 2000-2010 |
| 44,028 | 51,673 | +17% |
| 2013-2017 Estimate[4] | N/A | |
| Square Miles | 1.6 | |
| Population Density | 32,296/sq mi | |

**COMMUNITY BOARD PERSPECTIVES**

Top 3 pressing issues identified by Manhattan Community Board 5 in 2019:

1. Traffic
2. Trash removal & cleanliness
3. Homelessness

To learn more, please read Manhattan CD 5's Statements of Community District Needs and Community Board Budget Requests for Fiscal Year 2021.

Website: www.cb5.org
Email: office@cb5.org

**LAND USE MAP**

| Land Use Category | # Lots | % Lot Area |
|---|---|---|
| 1 & 2 Family Bldgs | 15 | 0% |
| Multifamily Walk-up | 77 | 1% |
| Multifamily Elevator | 187 | 5% |
| Mixed Use | 769 | 14% |
| Commercial | 1,641 | 66% |
| Industrial | 15 | 0% |
| Transportation/Utility | 22 | 3% |
| Public/Institutional | 113 | 7% |
| Open Space | 6 | 2% |
| Parking | 39 | 1% |
| Vacant | 88 | 1% |
| Other | 8 | 0% |

Map Source: PLUTO 19v2

## A Snapshot of Key Community Indicators

### COMMUNITY ASSETS[5]

| | |
|---|---|
| Public Schools | 15 |
| Public Libraries | 7 |
| Hospitals and Clinics | 17 |
| Parks | 10 |

Click to visit the NYC Facilities Explorer

### RENT BURDEN[4, 6]

| Manhattan CD 5 | Manhattan |
|---|---|
| **34%** | 37% |
| of households spent 35% or more of their income on rent | NYC 45% |

### ACCESS TO PARKS[7]

| Manhattan CD 5 | Citywide Target |
|---|---|
| **95%** | 85% |
| of residents live within walking distance of a park or open space | |

### MEAN COMMUTE TO WORK[4, 8]

| Manhattan CD 5 | Manhattan |
|---|---|
| **27** minutes | 32 minutes |
| | NYC 41 minutes |

### LIMITED ENGLISH PROFICIENCY[4]

| Manhattan CD 5 | Manhattan |
|---|---|
| **10%** | 16% |
| of residents 5 years or older have limited English proficiency | NYC 23% |

### CRIME RATE[9]

| Manhattan CD 5 | Manhattan |
|---|---|
| **87.2** | 15.7 |
| major felonies were reported per 1,000 residents in 2017 | NYC 11.8 |

### EDUCATIONAL ATTAINMENT[4, 10]

| Manhattan CD 5 | Manhattan |
|---|---|
| **74%** | 61% |
| of residents 25 years or older have earned a bachelor's degree or higher | NYC 37% |

### UNEMPLOYMENT[4, 10]

| Manhattan CD 5 | Manhattan |
|---|---|
| **3.7%** | 4.2% |
| of the civilian labor force was unemployed on average from 2013 to 2017 | NYC 4.9% |

### NYCgov POVERTY MEASURE[11]

| Manhattan CD 5 | Manhattan |
|---|---|
| **11%** | 14% |
| of residents have incomes below the NYCgov poverty threshold. See the federal poverty rate here | NYC 20% |

[1] Neighborhoods may be in multiple districts. Names and boundaries are not officially designated. [2] 2000 US Census. [3] 2010 US Census. [4] American Community Survey 2013-2017 5-Year Estimates, calculated for Public Use Microdata Areas (PUMAs). PUMAs are geographic approximations of community districts. MN 5 shares PUMA 3807 with MN 4, and the ACS population estimate cannot be reliably disaggregated. [5] NYC Dept of City Planning Facilities Database (2019). [6] Differences of less than 3 percentage points are not statistically meaningful. [7] NYC Dept of Parks and Recreation (DPR) (2019). DPR considers walking distance to be 1/4 mile for parks less than 6 acres, and 1/2 mile for larger parks and pools. [8] Differences of less than 2 minutes are not statistically meaningful. [9] NYPD CompStat, Historic Complaint Data (2018). [10] Differences of less than 2 percentage points are not statistically meaningful. [11] 2013-2017 NYCgov Poverty Measure by PUMA. This metric from the Mayor's Office for Economic Opportunity accounts for NYC's high cost of housing, as well as other costs of living and anti-poverty benefits.

## Location Description



**Location Description**



## City & Neighborhood Analysis

**The subject is located in Costar's Murray Hill Retail submarket of New York, NY**
The below city and neighborhood analysis is for the entire Murray Hill Retail submarket. When considering sales prices, vacancy rates and cap rates the appraiser relies on the subject's market and immediate submarket and chooses comparables sales in close proximity to the subject. Sales prices, vacancy rates and cap rates are therefore not exactly as indicated on the grids below which reflect the entire neighborhood.

## Overview

Murray Hill Retail

| 12 Mo Deliveries in SF | 12 Mo Net Absorption in SF | Vacancy Rate | Market Asking Rent Growth |
|---|---|---|---|
| **0** | **(127K)** | **23.4%** | **0.1%** |

The Murray Hill retail submarket has a vacancy rate of 23.4%. This vacancy rate is 20.4% higher than it was this time last year. There has been 130,000 SF of negative absorption and no net deliveries. Rents have increased 0.1% in the past 12 months and are currently around $160/SF.

Nothing is under construction in the Murray Hill retail submarket. In the past year, one sale has taken place for approximately $12.5 million.

Vacancy is 23.4% in general retail buildings, and there has been 130,000 SF of negative absorption in this asset class over the past year.

Current vacancy is higher than its trailing three-year average of 8.9%, which in turn, is higher than the trailing three-year average for the New York market as a whole, which is 4.0%. Rents have increased 4.2% over the past three years. Meanwhile, average rents increased 5.9% in the wider New York market. There has been 3 sales over the past three years, amounting to $15.0 million in volume and 21,000 SF of inventory.

The total Murray Hill retail submarket comprises 620,000 SF of inventory.

**KEY INDICATORS**

| Current Quarter | RBA | Vacancy Rate | Market Asking Rent | Availability Rate | Net Absorption SF | Deliveries SF | Under Construction |
|---|---|---|---|---|---|---|---|
| Malls | 0 | - | - | - | 0 | 0 | 0 |
| Power Center | 0 | - | - | - | 0 | 0 | 0 |
| Neighborhood Center | 0 | - | - | - | 0 | 0 | 0 |
| Strip Center | 0 | - | - | - | 0 | 0 | 0 |
| General Retail | 623,963 | 23.4% | $160.04 | 24.0% | (1,400) | 0 | 0 |
| Other | 0 | - | - | - | 0 | 0 | 0 |
| **Submarket** | **623,963** | **23.4%** | **$160.04** | **24.0%** | **(1,400)** | **0** | **0** |

| Annual Trends | 12 Month | Historical Average | Forecast Average | Peak | When | Trough | When |
|---|---|---|---|---|---|---|---|
| Vacancy Change (YOY) | 20.4% | 4.1% | 23.8% | 24.2% | 2023 Q4 | 0.9% | 2013 Q1 |
| Net Absorption SF | (127K) | (10,392) | (7,669) | 41,250 | 2007 Q4 | (133,319) | 2023 Q4 |
| Deliveries SF | 0 | 767 | 677 | 6,112 | 2020 Q2 | 0 | 2024 Q2 |
| Market Asking Rent Growth | 0.1% | 2.4% | 0.4% | 6.9% | 2007 Q4 | -5.4% | 2009 Q4 |
| Sales Volume | $12.5M | $8.5M | N/A | $61.1M | 2015 Q4 | $0 | 2023 Q3 |

## City & Neighborhood Analysis



## City & Neighborhood Analysis



### Leasing

**Murray Hill Retail**

**AVAILABILITY RATE**

Legend: ■ General Retail  ■ Murray Hill  ■ New York

**3 STAR MOST ACTIVE BUILDINGS IN SUBMARKET - PAST 12 MONTHS**

| Property Name/Address | Rating | GLA | Deals | Leased SF | 12 Mo Vacancy | 12 Mo Net Absorp SF |
|---|---|---|---|---|---|---|
| 127 E 34th St | ★★★☆☆ | 5,372 | 1 | 1,009 | 18.8% | 0 |
| 698 2nd Ave | ★★★☆☆ | 4,281 | 1 | 2,350 | 100% | 0 |

## City & Neighborhood Analysis

### Rent

**Murray Hill Retail**

**MARKET ASKING RENT GROWTH (YOY)**



Legend: General Retail, Murray Hill, New York

**MARKET ASKING RENT PER SQUARE FEET**



Legend: General Retail, Murray Hill, New York

## City & Neighborhood Analysis

### Construction

**Murray Hill Retail**

**DELIVERIES & DEMOLITIONS**



## City & Neighborhood Analysis



## City & Neighborhood Analysis

## Sales

Over the past year, there has been one sale in the Murray Hill retail submarket. This one sale traded for $1,099/SF, below the estimated submarket price of $1,381/SF. Over the past three years, Murray Hill has averaged 1 sale per year, $5.4 million of volume per year, and 8,100 SF of stock per year.

The one sale was that of the general retail subtype.

Over the past three years, transaction cap rates have averaged 5.8%. On average, there are fewer than 10 sales per year, so individual sales can significantly skew the result.

**SALES VOLUME & MARKET SALE PRICE PER SF**



## City & Neighborhood Analysis

### Sales



MARKET CAP RATE

Legend: General Retail | Murray Hill | New York

# City & Neighborhood Analysis

## Sales Past 12 Months

**Murray Hill Retail**

| Sale Comparables | Avg. Cap Rate | Avg. Price/SF | Avg. Vacancy At Sale |
|---|---|---|---|
| **1** | **-** | **$1,099** | **0%** |

**SALE COMPARABLE LOCATIONS**



**SALE COMPARABLES SUMMARY STATISTICS**

| Sales Attributes | Low | Average | Median | High |
|---|---|---|---|---|
| Sale Price | $12,497,623 | $12,497,623 | $12,497,623 | $12,497,623 |
| Price/SF | $1,099 | $1,099 | $1,099 | $1,099 |
| Cap Rate | - | - | - | - |
| Time Since Sale in Months | 6.8 | 6.8 | 6.8 | 6.8 |
| Property Attributes | Low | Average | Median | High |
| Building SF | 11,373 | 11,373 | 11,373 | 11,373 |
| Stories | 5 | 5 | 5 | 5 |
| Typical Floor SF | 2,275 | 2,275 | 2,275 | 2,275 |
| Vacancy Rate At Sale | 0% | 0% | 0% | 0% |
| Year Built | 1920 | 1920 | 1920 | 1920 |
| Star Rating | ★★ ☆ ☆ ☆ | ★★ ☆ ☆ ☆ 2.0 | ★★ ☆ ☆ ☆ | ★★ ☆ ☆ ☆ |

## City & Neighborhood Analysis

### The subject is located in Costar's Murray Hill Office submarket of New York, NY

**Overview**

**Murray Hill Office**

| 12 Mo Deliveries in SF | 12 Mo Net Absorption in SF | Vacancy Rate | Market Asking Rent Growth |
|---|---|---|---|
| **36.5K** | **369K** | **18.5%** | **-0.8%** |

Issues that have plagued the New York City office market since the onset of the pandemic, such as elevated levels of office availability and limited tenant demand, persist at the start of 24Q2. With a slowdown in the economy projected over the next year, the outlook for the remainder of 2024 is unlikely to deviate from current conditions.

In the Murray HillSubmarket, the tepid pace of new leasing persists among large occupiers as uncertainty surrounding their future headcount projections and actual office space needs persist. The Murray Hill Submarket remains vulnerable to significant space additions as long as tenant demand remains in this state. On the supply side, the availability rate in the Murray Hill Submarket, currently at 25.2%, remains higher than the 10% observed during the start of 2020. Available sublet space, in particular, remains elevated at 510,000 SF.

When leasing does occur in New York, however, it has been driven by a flight to quality from sizable occupiers in the financial and legal sectors are relocating to trophy office buildings in Midtown Manhattan. The Murray Hill Submarket is situated between Grand Central and Gramercy Park and has a concentration of inventory along Fifth, Madison, and Park Avenues, which remains a draw for potential occupiers. The law firm, Quinn Emanuel Urquhart & Sullivan, is moving their headquarters from 51 Madison Ave to Murray Hill's Textile Building at 295 Fifth Ave. The building underwent a complete gut and renovation, bringing it to 5 Star property in 2023. However, a flight-to-quality has tenants leaving the submarket for newer properties located elsewhere, as Murray Hill lacks a high number of modern office buildings that tenants covet.

Rents in the Murray Hill Submarket, measured at $54/SF, are below the Manhattan average of $70/SF. Despite the current imbalance between supply and demand, nominal asking rents remain relatively

unchanged. Asking rents trail those of Times Square and Grand Central by about 20%, and are about 30% behind those of the metro-leading Plaza District. Owners have been more eager to instead provide prospective tenants with discounts to the asking rents amid negotiations on top of offering concession packages that have grown increasingly generous over the past three years as owners compete fiercely for sizable tenants willing to make long-term commitments.

While concession packages are elevated, at a certain point, the cost of lease concessions will eat so far into income that it may no longer make sense for owners to keep increasing them beyond current levels which may then lead to asking rents declining. Likely to apply additional downward pressure on direct rents is that the amount of available sublease space in Murray Hill is elevated, at 510,000 SF, with some quality spaces reportedly priced at discounts of around $50/SF. If more affordable sublet space were to continue coming online, some owners may be forced to lower their direct rents due to this type of additional competition.

The market's performance and elevated interest level environment continue to produce near-record lows in transaction activity. Outside of trophy office buildings with solid rent rolls, potential buyers and lenders have little appetite for the office sector. About $40.1 million has traded hands over the past 12 months, well below the long-term annual average of $251 million. With cuts to the interest rate yet to occur, potential buyers are likely waiting for more distress to shake out before engaging the market.

Oxford Economics projects office-using employment growth in New York to moderate in 2024, providing little indication that the office sector will experience a near-term turnaround. The forecast projects rising vacancy levels leading to a decline in nominal asking rents, which calls for a continued decline in asset values.

**KEY INDICATORS**

| Current Quarter | RBA | Vacancy Rate | Market Asking Rent | Availability Rate | Net Absorption SF | Deliveries SF | Under Construction |
|---|---|---|---|---|---|---|---|
| 4 & 5 Star | 7,223,741 | 26.5% | $59.70 | 31.0% | 0 | 0 | 0 |
| 3 Star | 8,675,760 | 12.9% | $50.02 | 21.9% | 13,746 | 0 | 0 |
| 1 & 2 Star | 689,946 | 6.0% | $43.53 | 6.2% | (3,000) | 0 | 0 |
| **Submarket** | **16,589,447** | **18.5%** | **$53.96** | **25.2%** | **10,746** | **0** | **0** |

| Annual Trends | 12 Month | Historical Average | Forecast Average | Peak | When | Trough | When |
|---|---|---|---|---|---|---|---|
| Vacancy Change (YOY) | -2.0% | 7.0% | 23.2% | 20.7% | 2023 Q2 | 1.2% | 2000 Q2 |
| Net Absorption SF | 369K | (63,569) | (200,676) | 1,118,153 | 1998 Q1 | (1,639,972) | 2021 Q2 |
| Deliveries SF | 36.5K | 2,343 | 3,650 | 37,046 | 2000 Q4 | 0 | 2023 Q4 |
| Market Asking Rent Growth | -0.8% | 3.4% | 0% | 25.4% | 2000 Q4 | -20.4% | 2009 Q3 |
| Sales Volume | $40.2M | $264.5M | N/A | $1.7B | 2007 Q2 | $0 | 1999 Q4 |

## City & Neighborhood Analysis



# City & Neighborhood Analysis

## Leasing



**AVAILABILITY RATE**

Legend: Murray Hill 3 Star | Murray Hill 4-5 Star | Murray Hill | New York

### 4 & 5 STAR MOST ACTIVE BUILDINGS IN SUBMARKET - PAST 12 MONTHS

| Property Name/Address | Rating | RBA | Deals | Leased SF | 12 Mo Vacancy | 12 Mo Net Absorp SF |
|---|---|---|---|---|---|---|
| The Textile Bldg<br>295 5th Ave | ★ ★ ★ ★ ★ | 712,074 | 3 | 165,444 | 85.0% | 155,444 |
| 2 Park Avenue | ★ ★ ★ ★ ☆ | 1,182,707 | 7 | 131,024 | 21.8% | 62,054 |
| 200 Madison Ave | ★ ★ ★ ★ ☆ | 707,207 | 3 | 19,618 | 36.6% | 56,218 |
| 470 Park Ave S | ★ ★ ★ ★ ☆ | 301,178 | 4 | 51,411 | 27.8% | 39,927 |
| 122-126 E 32nd St | ★ ★ ★ ★ ☆ | 36,500 | 1 | 2,607 | 0% | 36,500 |
| 192 LEX<br>192 Lexington Ave | ★ ★ ★ ★ ☆ | 140,000 | 2 | 4,145 | 15.3% | 6,179 |
| 315 Fifth Ave | ★ ★ ★ ★ ☆ | 56,000 | 17 | 14,270 | 6.4% | 5,307 |
| 385 Fifth Ave | ★ ★ ★ ★ ☆ | 119,275 | 5 | 13,325 | 3.2% | 4,796 |
| 3 Park Ave | ★ ★ ★ ★ ☆ | 1,409,457 | 3 | 16,894 | 36.4% | 937 |
| 475 Park Ave S | ★ ★ ★ ★ ☆ | 464,841 | 3 | 10,318 | 42.4% | (62,350) |

## City & Neighborhood Analysis



## City & Neighborhood Analysis

### Construction

Murray Hill Office



**DELIVERIES & DEMOLITIONS**

v

## City & Neighborhood Analysis



### Construction

Murray Hill Office

| All-Time Annual Avg. Square Feet | Delivered Square Feet Past 8 Qtrs | Delivered Square Feet Next 8 Qtrs | Proposed Square Feet Next 8 Qtrs |
|---|---|---|---|
| 2,604 | 36,500 | 0 | 0 |

PAST 8 QUARTERS DELIVERIES, UNDER CONSTRUCTION, & PROPOSED

PAST & FUTURE DELIVERIES IN SQUARE FEET

Completed Past 8 Quarters    All-Time Average

## City & Neighborhood Analysis

### Sales

The weakened state of the office market is partially to blame for the relatively muted investment market. About $40.1 million has traded hands over the past 12 months, a figure which is well below the long-term historical average of $251 million. It should be noted that zero significant trades have occurred since May 2023. Murray Hill's elevated availability levels, a bevy of pre-war buildings in need of a major renovation, and lack of new construction imply that sales volume should remain muted for the time being. Although trades have not been occurring in the Murray Hill Submarket, office valuations have been negatively impacted across the board, regardless of building quality or rent roll, in major

transactions over the past year.

Market participants expect minimal pure office plays in the near term, as the appetite to transact has been lessened due to interest rates failing to decline thus far in 2024. Not helping matters is that regional banks are already under financial stress and are not actively looking to finance office acquisitions, instead opting to reduce their exposure to the office sector. In the meantime, opportunistic buyers patiently wait for capital events, such as loan maturations, in the hopes that forced transactions reveal the pricing reset underway.

**SALES VOLUME & MARKET SALE PRICE PER SF**



## City & Neighborhood Analysis

### Sales

Murray Hill Office



**MARKET CAP RATE**

Legend: Murray Hill 3 Star, Murray Hill 4-5 Star, Murray Hill, New York

## City & Neighborhood Analysis

### Sales Past 12 Months

Murray Hill Office

| Sale Comparables | Avg. Cap Rate | Avg. Price/SF | Avg. Vacancy At Sale |
|---|---|---|---|
| **5** | **-** | **$411** | **2.5%** |

SALE COMPARABLE LOCATIONS



SALE COMPARABLES SUMMARY STATISTICS

| Sales Attributes | Low | Average | Median | High |
|---|---|---|---|---|
| Sale Price | $4,100,000 | $17,715,938 | $17,715,938 | $31,331,875 |
| Price/SF | $318 | $411 | $476 | $970 |
| Cap Rate | - | - | - | - |
| Time Since Sale in Months | 1.0 | 4.6 | 4.1 | 10.0 |
| **Property Attributes** | **Low** | **Average** | **Median** | **High** |
| Building SF | 12,877 | 45,539 | 45,539 | 78,200 |
| Stories | 4 | 10 | 10 | 16 |
| Typical Floor SF | 3,219 | 4,053 | 4,053 | 4,888 |
| Vacancy Rate At Sale | 0% | 2.5% | 1.5% | 2.9% |
| Year Built | 1913 | 1949 | 1949 | 1984 |
| Star Rating | ★★☆☆☆ | ★★☆☆☆ 2.5 | ★★★☆☆ | ★★★☆☆ |

**Economic Market**

## Summary of Commentary on Current Economic Condition By Federal Reserve Bank of New York, May 29, 2024

### Summary of Economic Activity

On balance, economic activity in the Second District grew slightly in the latest reporting period. The labor market remained solid, with ongoing slight employment gains and moderate wage growth. Still, labor demand and labor supply continued to come into better balance. Selling price increases remained modest. Manufacturing activity declined modestly. Consumer spending grew slightly after slow sales in the spring. Tourism activity picked up in New York City. Housing markets remained solid, though low inventory continued to restrain sales. Commercial real estate markets weakened further. Activity in the finance sector declined slightly, with loan demand continuing to fall—though delinquency rates edged lower. Optimism about the outlook became more subdued.

### Labor Markets

Labor market conditions remained solid. On the whole, employment continued to increase slightly, with gains in leisure and hospitality, personal services, and health and education partially offset by ongoing reductions in information, construction, and manufacturing. A contact at an employment agency in New York City reported a notable uptick in hiring among financial services firms. Labor demand and labor supply continued to come into better balance. Still, businesses in the region reported ongoing difficulty finding the workers they need. These shortfalls are particularly acute in the service sector. Firms anticipate solid hiring in the coming months. Wage growth remained moderate during this reporting period, though contacts from trade, personal services, and construction firms noted sharper wage increases. The increase in New York State's minimum wage earlier this year is being felt by some food service and manufacturing firms.

### Prices

Selling price increases remained modest, and input price increases remained moderate. Still, the prices of some inputs have risen more rapidly, especially among service firms. Food and beverage businesses point to rapidly rising costs of cocoa and coffee, and contacts reported that obstructions to shipping in the Suez and Panama canals are causing shipping delays and pushing up the 9 cost of freight, putting additional pressure on selling prices. Businesses expect little change in pricing pressures in the months ahead.

## Economic Market

### Consumer Spending

Consumer spending picked up slightly after slow sales in the spring. Spending on goods mostly held steady, while spending on entertainment and recreation ticked up. Auto dealers in upstate New York reported solid but slowing new car sales, as the high cost of credit and some shipping logistics issues have limited sales activity. Interest rates on auto loans have risen noticeably in the past several months, and coupled with higher car prices, new cars have become unaffordable for many. With improved inventory levels, manufacturer and dealer incentives have become somewhat more prevalent. Sales of used cars have been solid, as the price gap between new and used cars has normalized.

### Manufacturing and Distribution

Manufacturing activity continued to decline modestly. Shipments were flat, and new orders continued to decline. Transportation and warehousing firms also reported a modest decline in activity, with a contact reporting that third party logistics companies have seen a particularly sharp decline in activity amid a retrenchment in consumer demand for goods. In contrast, wholesalers reported a strong increase in activity. Delivery times shortened, and supply availability was little changed. Still, contacts noted ongoing difficulty obtaining some supplies, including copper, various electronics, and heavy equipment. Manufacturers anticipate modest improvements in business conditions in the coming months.

### Services

Activity in the service sector increased slightly. Business services and leisure and hospitality continued to grow modestly, but the information sector saw a moderate decline. Service firms remained optimistic about the outlook, particularly those in the health and education sector. Tourism activity picked up in New York City. An industry expert reported that an unusually spread-out spring holiday calendar brought in a steady stream of international visitors, particularly from Europe and South America. Still, tourism from Asia has not fully recovered to pre-pandemic levels because of reduced flight availability due to more restricted flight patterns, and business travel was more limited during the spring holiday season. Hotel rates held steady but are notably more expensive than pre-pandemic levels. Many visitors are offsetting high hotel expenses with reductions in spending on retail and dining. Broadway show attendance continued to improve. While tickets for some shows were in very high demand, less successful productions have seen low attendance, and five Broadway theatres remain out of use.

# Economic Market

## Real Estate and Construction

Housing markets remained solid, though supply remains extremely constrained in most parts of the District. Although inventory has edged up, it is still too low to satisfy existing demand, and prices have continued to rise. Sellers are hesitant to list because of high prices and limited inventory when looking for a new home. Mortgage lock-in remains a significant factor, and many people are waiting for a modest decline in interest rates to consider listing. Manhattan is an exception, where inventory is near normal levels. Home prices on Long Island have risen significantly, particularly at the higher end of the market, while upstate New York has seen greater demand at the lower end and middle of the market. Residential rental markets continued to strengthen, and rents have risen across the District. Vacancy rates remain low, particularly in and around New York City, where rental vacancy rates are near long-term lows. Commercial real estate markets weakened further. The industrial market in Northern New Jersey saw significant increases in vacancy rates, with multiple tenants exiting leases and significant deliveries of new space. Activity in the Manhattan office sector edged up slightly after a notable worsening in the first quarter. Strong demand remains for new high-end office buildings, and rents in these buildings have been resilient, but lower quality buildings are seeing slowly declining demand. Rent concessions for office leases are at historic highs. Finance and legal firms continue to seek office space, while tech sector businesses continued to reduce their office footprints during this reporting period. Office markets in upstate New York and the New York City suburbs have remained more resilient. Sales of commercial real estate reached low levels, and were down significantly for office, retail, and multi-family, as the high cost of credit constrained demand and transactions. Construction contacts reported that activity continued to fall following a sharper contraction earlier in the year. Office construction remained at low volumes. Multi-family construction starts remained low across the District. Industrial construction was solid in Northern New Jersey but declined in upstate New York.

## Banking and Finance

Activity in the broad finance sector weakened slightly this period. On balance, small- to medium sized banks in the District reported slightly weaker loan demand, particularly for residential and commercial mortgages. Banking contacts indicated that credit standards continued to tighten for business loans and commercial mortgages but held steady for consumer loans and residential mortgages. Deposit rates increased, and loan spreads narrowed. Delinquency rates edged down slightly on business loans, consumer loans, and residential mortgages.

## Market Conclusion

Conclusion:

The economy has shown resiliency despite forecasts of recession and stagnation by pundits. Such predictions were based on high interest rates, slow growth and inflation exceeding the 2.0% annual target set by the Federal Reserve. However, it appears as though the elusive "soft landing" targeted by the federal reserve sans a recession might be a possibility after all.

In the first quarter of 2020, a new contagious virus, Covid-19 was rapidly spreading across the globe. Fear of such prompted governments to order travel bans, mandatory shutdowns as well as stay-at-home orders. Supply chains were interrupted, unemployment soared and healthcare facilities were overwhelmed. This resulted in severe negative impact on economies across the globe. The United States like the rest of the world was not spared with the coronavirus having devastating detrimental effect on the economy including the real estate sector, where transaction and dollar volume dropped precipitously.

Due to the pandemic, real estate transactions have slowed significantly from the first quarter of 2020 through the beginning of 2021. However, with the rolling out of vaccinations, as well as the lifting of shutdowns, the economy and real estate deal volume started recovering.

Since March 2021 through the end of the year, the nation and the local market continued improving. Lingering impacts of supply chain interruptions where demand outstripped supply, caused inflation to rise above the Federal Reserve's 2.0% annual target. As a direct result, starting in March 2022, the Fed increased the interest rate 11 consecutive times in the hopes of taming inflation. This in turn resulted in a real estate market cool down and declining values for some property types. Offices were hit the hardest as occupancies hit record lows deflating overall values due to changes in attitudes toward remote work. Additionally, capital markets shifts squeezed the borrowing power of buyers.

Although initially there was optimism that 2024 will see multiple cuts to interest rates based on signals from the Federal Reserve, recently, due to inflation growth being above the 2.0% annual target, it seems as if the Fed is adopting a wait-and-see attitude. Furthermore, it appears that at best, one rate cut may occur in 2024, and that is if financial indicators support such. Considerate of the above, the subject is considered to be located in a stable market with adequate demand for commercial properties with a cautiously optimistic outlook in the near term.

## Sales History

The appraiser is not aware of any sales or transfers within the past three years.

As far as the appraiser is aware, the subject units are not currently under contract or listed for sale.

## Site Description

In the site description the off-site, as well as on-site, improvements that make the site ready for its intended use or development are described. Any on-site improvements that add to or detract from a property's probable optimum use are noted. The quality, condition, and adequacy of sewers, curbs, utility hookups, and other improvements influence a site's use and value. This section describes land improvements such as grading, landscaping, fences, curbs, gutters, paving, walks, roads, and other man-made land improvements. The value of site improvements is typically considered part of site value.

| Location: | 172 Madison Avenue, New York, NY 10016 |
|---|---|
| **Block/Lot:** | Block: 863, Lots: 1101 and 1102 |
| **Subject Units** | CU-A and CU-B |
| **Census Tract:** | 0074.00 |
| **Lot Size:** | 10,704± square feet |
| **Frontage:** | The property possesses 84.06± front feet on Madison Avenue and 120± front feet on East 13th Street. |
| **Shape:** | L-Shaped |
| **Ingress / Egress:** | Pedestrian access is via Madison Avenue and East 33rd Street. |
| **Topography & Terrain:** | The site is level and at grade with the surrounding roadways. The property is improved with the building and site improvements. No adverse soil conditions were apparent at the time of inspection and based on the existence of the subject improvements and other neighboring structures, the load bearing qualities of the soil appear to be adequate. |
| **Site Improvements:** | The units were found to be in good condition. |
| **Flood Plain:** | The site is situated in Zone X, which is an area of minimal flood hazard determined to be outside the 500-year flood according to FEMA map, panel number 3604970201F, dated 09/05/2007, the site is not located within a flood zone (Zone X). |

# Improvement Description

General construction features of the current structure and unit are summarized below:

| | |
|---|---|
| **Gross Unit Area:** | 4,361± above grade square feet |
| **Year Completed:** | 2017± |
| **Stories** | Thirty-Two (32) |
| **Units** | 74; 72 residential, 1 medical office and 1 retail |
| **Framing:** | Aluminum |
| **Exterior Walls:** | Street facing exterior walls are glass. |
| **Windows:** | Storefront Windows |
| **Roof** | Flat Roof |
| **Plumbing & Sewage:** | Standard grade plumbing fixtures with cast iron waste lines. |
| **HVAC:** | Central AC and Heat |
| **Electrical & Lighting Systems:** | The building appears to be serviced by an adequate system. It appears to be that the improvements adequately comply with the building codes of the city. |
| **Sprinklers:** | Yes |
| **Elevator** | Yes |
| **Parking:** | Street Parking |

## Taxes & Assessment

Existing assessment trends or prospective changes in tax rates were analyzed. Current assessed values and ad valorem tax rates are reported as of the retrospective valuation and a calculation of the current annual tax load of the subject is included.

***Assessed Value***............................................................................................................
The value of a property according to the tax rolls in ad valorem taxation; may be higher or lower than market value, or based on an assessment ratio that is a percentage of market value."[11]

The 2024/2024 real estate taxes and assessments for the subject are described as follows.

| Block 863 | Lot 1101 | Lot 1102 | |
|---|---|---|---|
| Tax Class: | 4 | 4 | Totals |
| Market Value | $1,901,656 | $1,222,525 | $3,124,181 |
| Assessment Ratio | 45% | 45% | |
| Assessed Value | $855,746 | $550,136 | $1,405,882 |
| Transitional Assessed Value | $854,674- | $549,447 | $1,404,121 |
| Tax Rate | 10.592% | 10.592% | |
| Tax Bill 2023/2024 | $90,527.08 | $58,197.44 | $148,724.52 |

---

[11] The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022), p. 11.

**Taxes & Assessment**



**TAX MAP**

## Zoning

Land use and development may be regulated by city or county government, but it is also often subject to regional, state, and federal controls as well. In analyzing zoning and building codes, an appraiser considers all current regulations and the likelihood of a change in the code. Usually, a zone calls for a general use, such as residential, commercial or industrial, and then specifies a type or density of use. Zoning regulations may control the height and size of buildings, lot coverage, the number of units allowed, parking requirements, sign requirements, building setbacks, and other factors of importance to the highest and best use of the site.

Because land use restrictions and government programs in an area can affect land uses, they can also affect values. The construction of a specific type of property may enhance or detract from the value of the site and or any existing improvements, not to mention neighboring or adjoining uses. One of the criteria for the highest and best use conclusion is that the use must be legally permissible.

*Zoning* .........................................................................................................................
"Public regulation of the use of private land through application of police power; accomplished by establishing districts or areas with uniform requirements relating to lot coverage, setbacks, type of improvement, permitted activities, signage, structure height, minimum lot area, density, landscaping, and other aspects of land use and development. Zoning regulations are established by enactment of a local (city, town, or county) zoning ordinance."[12]

The appraiser has studied all the available zoning data and has determined that the subject property is located in an **C5-2 – commercial zoning district.**

---

12 The Dictionary of Real Estate Appraisal, 7th ed. (Chicago: Appraisal Institute, 2022), p. 207.

**Zoning**

## C5 – Commercial Zoning:

C5 is a central commercial district with continuous retail frontage intended for offices and retail establishments that serve the entire metropolitan region. Famous shopping streets, such as Fifth Avenue, Madison Avenue and East 57th Street are C5 districts. Parts of Lower Manhattan, Downtown Brooklyn and Long Island City are also within C5 districts.

Department stores, large office buildings, and mixed buildings with residential space above office or commercial floors, are typical C5 uses. Use Groups 5 (hotels), 6, 9 and 10 (retail shops and business services) and 11 (custom manufacturing) are permitted in C5 districts. Home maintenance services, auto rental establishments and other uses not in character with the district, including illuminated signs, are not permitted.

The maximum commercial floor area ratio (FAR) ranges from 4.0 to 15.0, and the maximum residential FAR is 10.0. Floor area may be increased by a bonus for a public plaza or Inclusionary Housing.

In the two contextual C5 districts—C5-1A and C5-2A—residential bulk and density are governed by R10A regulations. In non-contextual C5-2 through C5-5 districts, a building occupied by commercial, residential and/or community facility uses may be configured as a tower. A residential tower is also allowed in C5-1 districts.

All commercial uses in C5 districts are exempt from off-street parking requirements because public transportation is easily accessible.

## Zoning

## C5-  Commercial Zoning District

| C5 | Restricted Commercial District | | | | | |
|---|---|---|---|---|---|---|
| | C5-1 | C5-2 | C5-3 / C5-5 | C5-4 | C5-1A | C5-2A |
| Commercial FAR | 4.0 | 10.0 | 15.0 | 10.0 | 4.0 | 10.0 |
| Residential District Equivalent | R10 | R10 | R10 | R10 | R10A | |
| Required Accessory Parking PRC-B | | | None | | | |
| Permitted Sign Regulations (surface area) | 3 X street frontage (200 sf total) | 3 X street frontage (200 sf total) | 3 X street frontage (200 sf total) | 5 X street frontage (500 sf total) | 3 X street frontage (200 sf total) | |

# Zoning

## Analysis of The Zoning

An analysis of the zoning regulations in regard to the subject improvements appear to indicate that the subject meets the use and density requirements. The subject is considered to be legally conforming to local zoning codes.



**ZONING MAP**

| Lot Size (SF) | | FAR (10 + Plaza Bonus of 1.97) | | Total Buildable SF |
|---|---|---|---|---|
| | X | | = | |
| 10,704± SF | | 11.97 | | 128,132± SF |

The subject's total GBA, as per the ZD1 is 148,724± square feet above grade. After zoning deductions, the ZFA is 127,781± square feet. The subject is therefore considered to be legally conforming to the local zoning codes.

*Note: The appraiser is not an expert in analysis of New York City zoning regulations. If there is any question regarding zoning, it is recommended that a zoning expert be consulted.

# Highest and Best Use

The objective of the highest and best use analysis is to determine which use or uses produce the greatest return on capital, time and effort. In an appraisal, the concept of highest and best use represents the premise upon which value is based.

The reasoning for the highest and best use analysis is to establish guidelines, for use, that result in the highest return on investment. The process takes into consideration physical and legal restrictions as well as limitations imposed by economic factors.

For the purpose of this appraisal highest and best use is defined as:
*Highest and Best Use*........................................................

1. The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.
2. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid. (IVS)
3. [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform Appraisal Standards for Federal Land Acquisitions)

[For fair value determination] The use of a nonfinancial asset by market participants that would maximize the value of the asset or the group of assets and liabilities (for example, a business) within which the asset would be used. (FASB Glossary) The highest and best use of a nonfinancial asset takes into account the use that is physically possible, legally permissible, and financially feasible. (FASB 820-10-35-10B). The highest and best use of a nonfinancial asset establishes the valuation premise used to measure the fair value of the asset, as follows: (a) The highest and best use of a nonfinancial asset might provide maximum value to market participants through its use in combination with other assets as a group (as installed or otherwise configured for use) or in combination with other assets and liabilities (for example, a business). (b) The highest and best use of the asset might provide maximum value to market participants on a standalone basis. (FASB 820-10-35-10E)

## Highest and Best Use

The highest and best use conclusion is based upon a deductive process, first considering all uses and then eliminating those that do not meet the four criteria. A highest and best use determination of the subject is reached when all the reasonably probable alternatives have been considered and a conclusion has been reached as to the best among them. In order to establish the highest and best use of the subject, data is extracted from city, regional and governmental sources relative to the four criteria, and then analyzed. The results of the analysis are used to decide what impact this information has on the highest and best use of the subject.

The conclusion of highest and best use of the subject denotes specific parameters for selecting comparable information in the three approaches to value. Therefore, highest and best use is directly related to value.

## Highest and Best Use

### Analysis Of the Subject as If Vacant

**Legally Permissible:** Legal restrictions, as they apply to the subject property, include the public restrictions of zoning and the private restrictions of easements and restrictive covenants. The site is zoned *C5-2 commercial,* wherein residential, commercial and community uses are legally permitted. There are no known private restrictions on land uses. In addition, there are no known adverse easements, which affect the property.

**Physically Possible:** The shape and size of the parcel lends itself to a variety of residential, community facility and commercial development possibilities. The topography and soil compositions appear to be adequate to support development of the parcel based upon the existence of the subject improvements and the surrounding structures. As mentioned in the site description, the property is level at street grade. Therefore, the physical characteristics of the parcels do not inhibit development of the site.

**Financially Feasible:** The demand for vacant land in such a developed area is difficult to measure due to the scarcity of vacant land which can be developed in a financially feasible manner. Based upon the uses permitted within the zoning codes, the parcels could be improved with residential project that would have to provide a positive net return to the land to be economically feasible. Land of this size could support commercial and residential developments. The property is located within a densely developed commercial and residential district. Apartment rents and commercial rents as well as sale prices are stable.

**Maximally Productive**: Based upon the analysis of the legally permitted, physically possible and financially feasible uses for the property, the most profitable and highest and best use for the subject, as a vacant lot, is to develop the subject to the maximum allowed buildable square feet, under the current zoning codes.

# Highest and Best Use

## Analysis Of the Subject as Improved

This analysis of the subject as improved is a determination of what should be done with the existing improvement. There are three possible choices:  leave the existing improvement(s) unchanged, demolish the improvement(s), or modify the improvement(s).

*Legally Permissible:*  Legal restrictions, as they apply to the subject property, include the public restrictions of zoning and the private restrictions of easements and restrictive covenants.  The site is zoned *C5-2 commercial*, wherein residential, commercial and community uses are permitted.  There are no known private restrictions on land uses.  In addition, there are no known adverse easements, which affect the property.

*Physically Possible:*  The shape and size of the parcel lends itself to a variety of residential and commercial development possibilities. The topography and soil compositions appear to be adequate to support development of the parcel based upon the existence of the subject improvements and the surrounding structures.  As mentioned in the site description the property is level at street grade.  Therefore, the physical characteristics of the parcels do not inhibit development of the site.

*Financially Feasible:*  The property is located within a densely developed, commercial and residential district.  Apartment and commercial rents are at levels that would provide an economic return.

*Maximally Productive:*  Based upon the analysis of the legally permitted, physically possible and financially feasible uses for the property, the most profitable and highest and best use of the parcel, as currently improved, is for its continued use.

**Valuation Process**

*Market Value:* The valuation process contains all the steps necessary for this type of assignment. The appraisal process also establishes the methodology for estimating many other forms of value. A specific series of procedures constitutes the valuation process; the application of these procedures depends on the nature of the appraisal assignment and the data available.

Traditional appraisal theory applies three approaches to arrive at an estimate of value. The foundations for these approaches are **Cost**, **Market** (Sales Comparison) and **Income**. One or more approaches to value may be used depending on their applicability to the particular appraisal assignment. All three approaches are applicable to many appraisal problems, but one or more of the approaches may have greater significance in a specific assignment. Wherever possible, the appraiser applies the approach or approaches deemed most appropriate in order to arrive at a final value estimate.

In an appraisal assignment, the ultimate goal of the valuation process is a well-supported conclusion that reflects all the factors that influence the value of the property being appraised. To achieve this goal, an appraiser studies a property from three different viewpoints, which correspond to the three traditional approaches to value. Other procedures such as the use of inferential statistics, regression analysis and economic models also contribute to the valuation process by providing the basis for assumptions, forecasts and conclusions.

From the approaches applied, the appraiser derives separate indications of value for the property being appraised. One or more of the approaches may not be applicable to a specific assignment or may be less reliable due to the nature of the property, the needs of the client, or the data available. The alternative value indicators approach value from various points of perception, thus addressing the different reasoning and rational for the final conclusion. In addition, alternative methods can serve as useful checks on one

**Valuation Process**

another.   The appraisal process is reconciled in a conclusion which integrates the information drawn from market research and data with the appropriate valuation techniques.  This conclusion may be presented as a single point estimate of value or as a range within which the value may fall.

This appraisal will utilize the Sales Comparison and Income Approaches to value respectively. The subject is a unit within a condominium building. The Cost Approach was therefore not considered to be an accurate value indicator and was not used.

## Sales Comparison Approach

The Sales Comparison Approach is the process in which a Market Value estimate is derived by analyzing the market for similar properties and comparing these properties to the subject. Estimates of market rent, cost, depreciation, and other value parameters may be derived in the other approaches to value using comparative techniques. Often these elements are also analyzed in the Sales Comparison Approach to determine the adjustments to be made to the sale prices of comparable properties. The comparative techniques of analysis applied in the Sales Comparison Approach are fundamental to the valuation process.

In the Sales Comparison Approach, market value is estimated by comparing the subject to similar properties that have recently sold, are listed for sale, or are under contract (i.e., recently drawn up purchase offers accompanied by a cash or equivalent deposit). A major premise of the Sales Comparison Approach is that the market value of a property is directly related to the prices of comparable, competitive properties.

The comparative analysis performed in the approach focuses on similarities and differences among properties and transactions that affect value. These may include differences in the property rights appraised, the motivations of buyers and sellers, financing terms, market conditions at the time of sale, size, location, physical features, and if the properties produce income, economic characteristics. Elements of comparison are tested against market evidence to determine which elements are sensitive to change and how they affect value.

## Sales Comparison Approach

### Procedure

To apply the Sales Comparison Approach, an appraiser follows a systematic procedure. A general outline of the basic procedure follows.

1. Research the market to obtain information on sales transactions, listings, and offers to purchase or sell properties that are similar to the subject property in terms of characteristics such as property type, date of sale, size, location, and zoning.
2. Verify the information by confirming that the data obtained are factually accurate and that the transactions reflect arm's-length market considerations. Verification may also elicit additional information about the market.
3. Select relevant units of comparison) e.g., income multipliers or dollars per acre or per square foot) and develop a comparative analysis for each unit.
4. Compare comparable sale properties with the subject using the elements of comparison and adjust the sale price of each comparable appropriately to the subject to varying occupancies and economies, a resulting range of values may be a better conclusion than a single value estimate in certain cases.

Adjustments can be made either to total property prices or to appropriate units of comparison. Often adjustments for the property rights conveyed, financing, conditions of sale (motivation), and date of sale (market conditions) are made to the total sale price. The adjusted price is then converted into a unit price (e.g., per square foot, per apartment unit, or per acre) and adjusted for other elements of comparison such as location and physical characteristics.

The Sales Comparison Approach will be used to derive market value. In the case of the subject, the unit of comparison selected is the price per square foot as this is typically the measure by which this type of property is valued.

## Sales Comparison Approach

On the following pages, sales of similar commercial condominiums are presented. The sold properties represent units similar to the subject, situated within the subject immediate and surrounding neighborhood. In the discussion below, the appraiser outlines various adjustments for market factors which differ from those of the subject.

***Adjustment Process Overview:*** In analyzing comparable sales data, it is important to note that the adjustment process adjusts the comparable sales to the subject. In adjusting for significant variations between the subject and the comparable properties, the analysis includes a percent adjustment reflecting the appropriate market reaction to those items. If a significant item in the comparable property is superior to, or more favorable than, the subject, a minus (-) adjustment is made, thus reducing the indicated value of the subject; if a significant item in the comparable is inferior to, or less favorable than, the subject, a plus (+) adjustment is made, thus increasing the indicated value of the subject. For example, if the comparable sale has a location inferior to the subject, it would require an upward adjustment in order to reflect the subject's geographical characteristics. All adjustments utilized will follow this process of adjusting the comparable sale to the subject.

**Real Property Rights Conveyed:** The transaction price can be based upon the property interest conveyed. Commercial condominiums can either transfer fee simple, for owner use, or leased fee, for investment. No adjustments were necessary.

**Financing Terms:** A property's sales price can also be influenced by the financing obtained to purchase the property. Any unusual financing such as below rate financing, balloon mortgages, installment sales contracts or any other unusual financing is examined and any appropriate adjustment is applied if necessary. No adjustments were necessary.

**Conditions of Sale:** Conditions of sale adjusts for the motivation of the buyer and seller. An appropriate adjustment is developed based on whether the sale was an arm's length transaction, a distressed property sale, a foreclosure or a land assemblage. The comparables were verified to be arm's length transactions. No adjustments were necessary.

**Date of Sale/Market Conditions:** This adjustment reflects the change in value from the date of sale to the date of appraised value caused by changes in market conditions. The

## Sales Comparison Approach

adjustments applied to the comparables are derived from primary and secondary data extracted from the market as well as information provided by financial institutions and real estate publications. All comparables sold within the past three years. No adjustments were deemed necessary.

**Location:** The factors that are considered in developing a location adjustment include visibility, access to major highways and traffic flow. After these factors are considered, an appropriate adjustment is developed and applied to the comparable sale. The comparable sales were appropriately adjusted for their difference in location.

**Square feet:** The market recognizes an economy of scale whereby units with more square feet sell at a lower price per square foot than units with less square feet. Appropriate adjustments were applied to the comparable sales to reflect the difference in square feet.

**Cellar Space:** The subject units feature additional square feet in the cellar. Based on the condo declarations, comparables 1 and 4 do not feature cellar space. Appropriate adjustments were therefore applied.

**Year Built/Condition:** The subject was recently built and found to be in good/new condition at time of inspection. Comparable 2 is an older building and was therefore adjusted.

**Lot Influence:** The market recognizes and economy of scale, whereby corner units sell at a higher price per square foot than units situated mid-block. The subject units are situated in a building located on a corner lot. Comparable units that are situated at a mid-block lot, were adjusted for their inferiority.

**Zoning:** The subject and comparables are located in similar zoning districts. No adjustments were deemed necessary.

## Sales Comparison Approach



**Comparable Sale #1: 214 East 14th Street, New York, NY**

## Sales Comparison Approach

| Address | 214 East 14th Street |
|---|---|
| Location | New York, NY |
| Proximity to Subject | 1.02 |
| Block-Lot | 469-1501 |
| Gross Unit Area (SF) | 1,064 |
| Lot Size (SF) | 22,922 |
| Property Type | RK |
| Zoning | C1-6A |
| Property Rights | Leased Fee |
| Year Completed | 2014± |
| Date of Sale | 6/30/2023 |
| Sale Price | $2,700,000 |
| Price Per SF | $2,538 |
| Grantor | CBW 14th Street LLC |
| Grantee | 208 East LLC |
| Financed By | Wells Fargo Bank, National Association, As Trustee |
| Mortgage Amount | $1,825,000 |

**Notes:**
Comparable sale 1 consists of a retail condominium unit.

The sale was utilized as it is similar in condition and use to the subject.

## Sales Comparison Approach



**Comparable Sale #2: 730 5th Avenue, New York, NY**

## Sales Comparison Approach

| Address | 730 5th Avenue |
| --- | --- |
| Location | New York, NY |
| Proximity to Subject | 1.16 |
| Block-Lot | 1272-1225 |
| Gross Unit Area (SF) | 4,406 |
| Lot Size (SF) | 26,360 |
| Property Type | RK |
| Zoning | C5-3/ C5-P/MID |
| Property Rights | Fee Simple |
| Year Completed | 1921± |
| Date of Sale | 4/22/2024 |
| Sale Price | $12,605,000 |
| Price Per SF | $2,861 |
| Grantor | 730 Fifth Retail, LLC |
| Grantee | 720 Fifth USA, LLC |
| Financed By | NA |
| Mortgage Amount | $0 |

**Notes:**
Comparable sale 2 consists of a retail condominium unit.

The sale was utilized as it is similar in use to the subject. Furthermore, it is a very recent sale indicating the current market value.

## Sales Comparison Approach



**Comparable Sale #3: 277 5th Avenue, New York, NY**

## Sales Comparison Approach

| Address | 277 5th Avenue |
|---|---|
| Location | New York, NY |
| Proximity to Subject | 0.18 |
| Block-Lot | 859-1501 |
| Gross Unit Area (SF) | 8,645 |
| Lot Size (SF) | 7,308 |
| Property Type | RK |
| Zoning | C5-2 |
| Property Rights | Fee Simple |
| Year Completed | 2019± |
| Date of Sale | 2/22/2022 |
| Sale Price | $23,000,000 |
| Price Per SF | $2,660 |
| Grantor | Victor Nomad LLC |
| Grantee | Italy NY LLC |
| Financed By | NA |
| Mortgage Amount | $0 |

**Notes:**
Comparable sale 3 consists of a commercial condominium unit located in close proximity to the subject.

The sale was utilized as it is similar in style and condition to the subject. Furthermore, it has above and below grade square feet; similar to the subject.

**Sales Comparison Approach**



**Comparable Sale #4: 245 10th Avenue, New York, NY**

## Sales Comparison Approach

| Address | 245 10th Avenue |
|---|---|
| Location | New York, NY |
| Proximity to Subject | 1.06 |
| Block-Lot | 969-1101 |
| Gross Unit Area (SF) | 2,158 |
| Lot Size (SF) | 6,332 |
| Property Type | RK |
| Zoning | C6-3/WCH |
| Property Rights | Fee Simple |
| Year Completed | 2013± |
| Date of Sale | 4/29/2022 |
| Sale Price | $4,100,000 |
| Price Per SF | $1,900 |
| Grantor | #REF! |
| Grantee | 505 W 24 LLC |
| Financed By | Sawyerville Management LLC |
| Mortgage Amount | $0 |

**Notes:**
Comparable sale 4 consists of a commercial condominium unit.

The sale was utilized as it appears to be similar in style and condition to the subject.

**Sales Comparison Approach**

## COMPARABLE SALES MAP

**Sales Comparison Approach**

| | SUMMARY OF COMPARABLE SALES | | | | |
|---|---|---|---|---|---|
| | SALES COMPARISON APPROACH | | | | |

| Comparable Sales | | | | | |
|---|---|---|---|---|---|
| | Subject | Comparable Sale #1 | Comparable Sale #2 | Comparable Sale #3 | Comparable Sale #4 |
| Address | 172 Madison Avenue | 214 East 14th Street | 730 5th Avenue | 277 5th Avenue | 245 10th Avenue |
| Unit | CUA & CUB | COM1 | Annex | Commercial | 1W |
| Location | New York, NY | New York, NY | New York, NY | New York, NY | New York, NY |
| Proximity to Subject | | 1.02 | 1.16 | 0.18 | 1.06 |
| Block-Lot | 863-1101 & 1102 | 469-1501 | 1272-1225 | 859-1501 | 969-1101 |
| Gross Unit Area (SF) | 4,361 | 1,064 | 4,406 | 8,645 | 2,158 |
| Lot Size (SF) | 10,752 | 22,922 | 26,360 | 7,308 | 6,332 |
| Property Type | RK | RK | RK | RK | RK |
| Zoning | C5-2 | C1-6A | C5-3/ C5-P/MID | C5-2 | C6-3/WCH |
| Property Rights | Leased Fee | Leased Fee | Fee Simple | Fee Simple | Fee Simple |
| Year Completed | 2017± | 2014± | 1921± | 2019± | 2013± |
| Date of Sale | | 6/30/2023 | 4/22/2024 | 2/22/2022 | 4/29/2022 |
| Sale Price | | $2,700,000 | $12,605,000 | $23,000,000 | $4,100,000 |
| Price Per SF | | $2,538 | $2,861 | $2,660 | $1,900 |
| Grantor | | CBW 14th Street LLC | 730 Fifth Retail, LLC | Victor Nomad LLC | Sawyerville Management LLC |
| Grantee | | 208 East LLC | 720 Fifth USA, LLC | Italy NY LLC | 505 W 24 LLC |
| Financed By | | Wells Fargo Bank, National Association, As Trustee | NA | NA | NA |
| Mortgage Amount | | $1,825,000 | $0 | $0 | $0 |

## Sales Comparison Approach

| | Subject | Comparable Sale #1 | Comparable Sale #2 | Comparable Sale #3 | Comparable Sale #4 |
|---|---|---|---|---|---|
| **Adjustments** | | | | | |
| Address | 172 Madison Avenue | 214 East 14th Street | 730 5th Avenue | 277 5th Avenue | 245 10th Avenue |
| Property Rights | Leased Fee | 0.0% | 0.0% | 0.0% | 0.0% |
| Financing Terms | | 0.0% | 0.0% | 0.0% | 0.0% |
| Conditions of Sale | | 0.0% | 0.0% | 0.0% | 0.0% |
| Market Conditions (time) | | 0.0% | 0.0% | 0.0% | 0.0% |
| | | 0.0% | 0.0% | 0.0% | 0.0% |
| Adjusted Price psf | | $2,538 | $2,861 | $2,660 | $1,900 |
| Location | | Similar | Superior | Superior | Inferior |
| | | 0.0% | -5.0% | -5.0% | 10.0% |
| Gross Unit Area | 4,361 | Smaller | Similar | Larger | Smaller |
| | | -5.0% | 0.0% | 5.0% | -2.5% |
| Cellar Space | Yes | Inferior | Similar | Similar | Inferior |
| | | 5.0% | 0.0% | 0.0% | 5.0% |
| Year Built - Condition | Good | Similar | Inferior | Similar | Similar |
| | | 0.0% | 5.0% | 0.0% | 0.0% |
| Lot Influence | Corner | Mid-Block | Corner | Corner | Mid-Block |
| | | 5.0% | 0.0% | 0.0% | 5.0% |
| Zoning | C5-2 | Similar | Similar | Similar | Similar |
| | | 0.0% | 0.0% | 0.0% | 0.0% |
| Net Adjustments | | 5.0% | 0.0% | 0.0% | 17.5% |
| Adjusted Sale Price Per Square Foot | | $2,664 | $2,861 | $2,660 | $2,233 |
| **Price per Square Foot** | | | | | |
| Minimum | $2,233 | | | | |
| Maximum | $2,861 | | | | |
| Median | $2,662 | | | | |
| Average | $2,605 | | | | |

## Sales Comparison Approach

***Remarks & Conclusions*** The adjustment process considers the value of the subject "as is". The appraiser analyzed the comparable sales and after adjustments noted a range from $2,233 to $2,861 per square foot with a median of $2,662 and an average of $2,605 per square foot.

The appraiser considered each comparable sales' similarities individually, when concluding to a value per square foot. However, least weight was given to comparable sale 4 as it appears to be an outlier.

| (Above Grade Square feet) | x | (Est. Value PSF) | = | (Total Value) |
|---|---|---|---|---|
| 4,361 SF | x | $2,750 PSF | = | $11,992,750 |
| | | | *Say* | **$12,000,000** |

Based on the preceding analysis, the As Is Market Value of the subject units via the Sales Comparison Approach, is concluded to be:

<u>**TWELVE MILLION DOLLARS**</u>
**$12,000,000**

## The Income Capitalization Approach

Income-producing real estate is typically purchased as an investment, and from an investor's point of view earning power is the critical element affecting property value. One basic investment premise is that the higher the earnings, the higher the value. An investor who purchases income-producing real estate is essentially trading present dollars for the right to receive future dollars. The income capitalization approach to value consists of methods, techniques, and mathematical benefits (i.e., usually the monetary benefits of income and reversion) and the conversion these benefits to an indication of present value.

The Income Capitalization Approach is one of the three traditional approaches that an appraiser may use in the valuation process. However, it is not an independent system of valuation that is unrelated to the other approaches. The valuation process as a whole is composed of integrated, interrelated, and inseparable techniques and procedures designed to produce a convincing and reliable estimate of value, usually market value.

The analysis of cost and sales data is often an integral part of the income capitalization approach, and capitalization techniques are frequently employed in the Cost and Sales Comparison approaches. Capitalization techniques are commonly used to analyze and adjust sales data in the Sales Comparison Approach; in the Cost Approach, obsolescence is often measured by capitalizing an estimated rent loss. The Income Capitalization Approach is described herein as part of the systematic valuation process, but the various methods, techniques, and procedures used in the approach are general-purpose analytical tools applicable in the valuation and evaluation of income-producing properties.

## The Income Capitalization Approach

This report will employ the technique of the Income Capitalization Approach known as Direct Capitalization of income.  The procedure for employing the Direct Capitalization is as follows:

- Project the Potential Gross Income (PGI), which is the total income attributable to the property at full occupancy before deduction for vacancy and operating expenses.

- Project the appropriate factor for vacancy and collection loss from the subject's operating history or market-derived information.

- Project fixed and variable expenses that would typically occur at periodic rates during the projection period.

- Subtract the projections of fixed and variable expenses, as well as vacancy and collection loss from Potential Gross Income; resulting in Net Operating Income.

- Utilize investor surveys or other market-derived data to choose an appropriate cap rate.  The capitalization rate is used to capitalize the stabilized NOI.

The applicable assumptions and conclusions of the Direct Capitalization Analysis in regard to the subject are located on the succeeding pages of this appraisal report.

## Subject Rent Roll

The subject consists of a medical office and retail unit located on the first floor of a thirty two-story mixed-use, condominium, building, known as the 172 Madison Avenue Condominium.

The subject of this appraisal is the medical office unit known as unit CU-A and the retail unit known as unit CU-B both units are located on the first floor with additional storage space in the cellar. As per the condo declaration, the units contain a total of 4,361± square feet on the first floor and 2,039± square feet in the cellar. The units were informed to be tenant occupied and were found to be in good condition at time of inspection.

The appraiser was provided with the rent roll and leases for the subject units. The appraiser researched the market for similar units in the subject area and noticed that the provided rent amounts are in line with market rent. The actual rent amounts were therefore utilized.

The rent was provided to be on a triple net (NNN) basis, where the tenant is responsible for the base rent, and in addition pays its own utilities, water, sewer and reimburses real estate taxes, insurance and common charges.

| Actual Rent Roll | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit | Lot. No. | Unit Type | Tenant | SF Above Grade | Cellar SF | Monthly Rent | Annual Rent | Rent PSF | Lease Type | Lease Start | Lease Expiration |
| CUA | 1101 | Medical Office | 209 NYC Dental LLP | 2,754 | 843 | $47,352 | $568,218 | $206.32 | NNN | 07/01/21 | 06/30/31 |
| CUB | 1102 | Retail | Noda North America Inc | 1,607 | 1,196 | $22,918 | $275,010 | $171.13 | NNN | 11/18/23 | 03/31/33 |
| | | Totals | | 4,361 | | $70,269 | $843,228 | | | | |
| | | Total Annual Rent | | | | | $843,228 | | | | |

**Rental Comparables**



*Source: Costar*

The above rentals show a range from $136 per square foot to $264.00 per square foot. The subject's provided rent amounts appear to be in line with market rent and was therefore utilized.

## Income and Expense Assumptions

### Potential Gross Income

**Rental Revenue:** The potential gross income of $1,017,072, was developed based on the provided rent and reimbursements.

### Vacancy & Collection Loss

The local market storefront vacancy as of 2023 is at 17% for Manhattan community district 5. An overall 10% loss factor was estimated, based on the market improvements, good condition and location.

| Aggregate Level | Aggregate ID | # Operating Storefronts | # Total Storefronts | Storefront Vacancy Rate |
|---|---|---|---|---|
| BOROUGH | MANHATTAN | 32648 | 38493 | 15% |
| COMMUNITY DISTRICT | 105 | 4649 | 5601 | 17% |

### Effective Gross Income

Effective gross income (EGI) is the anticipated income from all operations of the real property adjusted for vacancy and collection losses. This adjustment covers losses incurred due to turnover, and nonpayment of rent by tenants. EGI is $915,365.

## Income and Expense Assumptions

**OPERATING EXPENSES**

The appraiser researched the expense of recently built buildings. The expense comparables are illustrated in the tables below on a per square foot basis.

| EXPENSE COMPARABLES PER SQUARE FOOT | | | | | | |
|---|---|---|---|---|---|---|
| Address | Block-Lot | Year Built | Stories | Unit Size | Taxes | Insurance |
| 125 West 31 Street | 807-1002 | 2005 | 59 | 3,669 | $29.96 | $1.34 |
| 66 West 38 Street | 839-1102 | 2001 | 46 | 12,807 | $37.00 | $1.18 |
| 160 Madison Avenue | 862-1601 | 2013 | 43 | 22,140 | $15.24 | $1.28 |
| 325 Lexington Avenue | 894-2001 | 2013 | 33 | 2,594 | $37.12 | $1.23 |
| 1 East 35th Street | 865-1101 | 2005 | 33 | 34,133 | $33.09 | $0.14 |
| MIN | | 2001 | 33 | 2,594 | $15.24 | $0.14 |
| MAX | | 2013 | 59 | 34,133 | $37.12 | $1.34 |
| MED | | 2005 | 43 | 12,807 | $33.09 | $1.23 |
| AVG | | 2007 | 43 | 15,069 | $30.48 | $1.03 |

### Real Estate Taxes

The subject's combined taxes for year 2024 is $148,725. The tax comparables show a range from $15.24 to $37.12. The actual taxes at $34.10 per square foot are therefore considered to be accurate. The real estate taxes are reimbursed by the tenants as typical in a triple net lease.

### Insurance

The insurance comparables show a range from $0.14 to $1.34 per square foot. The subject's insurance expense is informed to be at $5,167 per year and $1.18 per square foot. The insurance expense appears to be in line with market. The insurance expense is reimbursed by the tenants; as typical in a triple net lease.

## Income and Expense Assumptions

### Common Charges

Common charges were provided to be $19,953 per year.

### Management

This is an all-inclusive expense category including rent collection, advertising, and miscellaneous items. Market participants typically calculate this expense at 3% to 5% of effective gross income. Management and other expense were set at 3% of effective gross income.

### Utilities

The utilities expense was provided to be paid by the tenants.

Water and sewer was provided to be paid by the tenants.

### Unit Reserves

This expense category is a sinking fund that covers roof replacement, boiler replacement and other items needed to extend the life of major building components. Reserves for the units are calculated at $0.25 per square foot.

### Legal and Professional

Legal and professional is estimated at $5,000 per year.

**Rate Selection**

Estimate of Capitalization Rate

**Market Rates Extracted from Sales**:

The *PwC* Real Estate Investor Survey for the National Medical Office Buildings Market, as of 2Q' 2024 indicates a range of cap rates from 5.75% to 10.00%, averaging 7.39%.

## NATIONAL MEDICAL OFFICE BUILDINGS MARKET

Second Quarter 2024

| | CURRENT | LAST QUARTER | 1 YEAR AGO | 3 YEARS AGO | 5 YEARS AGO |
|---|---|---|---|---|---|
| **DISCOUNT RATE (IRR)**[a] | | | | | |
| Range | 6.50% – 11.00% | 6.25% – 11.00% | 6.00% – 11.00% | 5.00% – 11.00% | 5.75% – 11.00% |
| Average | 8.75% | 8.38% | 8.18% | 7.85% | 7.70% |
| Change (Basis Points) | | + 37 | + 57 | + 90 | + 105 |
| **OVERALL CAP RATE (OAR)**[a] | | | | | |
| Range | 5.75% – 10.00% | 5.50% – 10.00% | 5.25% – 10.00% | 4.00% – 10.50% | 4.25% – 10.00% |
| Average | 7.39% | 7.48% | 6.91% | 6.53% | 6.61% |
| Change (Basis Points) | | – 9 | + 48 | + 86 | + 78 |
| **RESIDUAL CAP RATE** | | | | | |
| Range | 5.75% – 10.25% | 5.75% – 10.25% | 5.50% – 10.25% | 5.00% – 10.25% | 5.00% – 10.25% |
| Average | 7.56% | 7.94% | 7.24% | 6.80% | 6.75% |
| Change (Basis Points) | | – 38 | + 32 | + 76 | + 81 |
| **MARKET RENT CHANGE**[b] | | | | | |
| Range | 0.00% – 4.00% | 0.00% – 4.00% | 0.00% – 4.00% | 0.00% – 3.00% | 0.00% – 3.00% |
| Average | 2.50% | 2.17% | 2.50% | 1.80% | 2.21% |
| Change (Basis Points) | | + 33 | 0 | – 70 | + 29 |
| **EXPENSE CHANGE**[b] | | | | | |
| Range | 2.00% – 5.00% | 2.00% – 5.00% | 2.00% – 5.00% | 1.00% – 4.00% | 1.00% – 3.00% |
| Average | 3.38% | 3.33% | 3.30% | 2.55% | 2.33% |
| Change (Basis Points) | | + 5 | + 8 | – 83 | + 105 |
| **MARKETING TIME**[c] | | | | | |
| Range | 1 – 12 | 1 – 12 | 1 – 12 | 1 – 12 | 1 – 12 |
| Average | 5.4 | 6.0 | 5.2 | 4.7 | 4.9 |
| Change (▼, ▲, =) | | ▼ | ▲ | ▲ | ▲ |
| **FORECAST VALUE CHANGE**[d] | | | | | |
| Range | (20.0%) – 10.0% | (15.0%) – 10.0% | (20.0%) – 10.0% | (20.0%) – 15.0% | (15.0%) – 10.0% |
| Average | (5.0%) | (3.3%) | (4.4%) | 0.7% | (0.5%) |
| Change (▼, ▲, =) | | ▼ | ▼ | ▼ | ▼ |

a. Rate on unleveraged, all-cash transactions b. Year-one rate of change c. In months d. Over next 12 months

Source: PwC Investor Survey: survey conducted by PwC during April 2024

## Rate Selection

The *PwC* Real Estate Investor Survey for the National Strip Shopping Center Market, as of 2Q' 2024 indicates a range of cap rates from 5.50% to 10.00%, averaging 7.33%.

## NATIONAL STRIP SHOPPING CENTER MARKET
Second Quarter 2024

| | CURRENT | LAST QUARTER | 1 YEAR AGO | 3 YEARS AGO | 5 YEARS AGO |
|---|---|---|---|---|---|
| **DISCOUNT RATE (IRR)**[a] | | | | | |
| Range | 7.00% – 11.00% | 6.75% – 11.00% | 6.50% – 12.00% | 6.50% – 11.00% | 5.50% – 11.00% |
| Average | 8.60% | 8.69% | 8.83% | 8.35% | 7.81% |
| Change (Basis Points) | | – 9 | – 23 | + 25 | + 79 |
| **OVERALL CAP RATE (OAR)**[a] | | | | | |
| Range | 5.50% – 10.00% | 5.25% – 10.00% | 5.00% – 10.00% | 5.00% – 10.00% | 4.25% – 10.00% |
| Average | 7.33% | 7.42% | 7.17% | 7.35% | 6.75% |
| Change (Basis Points) | | – 9 | + 16 | – 2 | + 58 |
| **RESIDUAL CAP RATE** | | | | | |
| Range | 5.25% – 10.00% | 5.25% – 10.00% | 5.25% – 10.00% | 5.00% – 10.00% | 4.50% – 10.00% |
| Average | 7.50% | 7.38% | 7.29% | 7.38% | 7.00% |
| Change (Basis Points) | | – 12 | + 21 | + 12 | + 50 |
| **MARKET RENT CHANGE**[b] | | | | | |
| Range | 0.00% – 4.00% | 0.00% – 3.00% | 0.00% – 8.00% | 0.00% – 3.00% | 0.00% – 3.00% |
| Average | 1.40% | 1.30% | 2.25% | 0.90% | 1.67% |
| Change (Basis Points) | | + 10 | – 85 | + 50 | – 27 |
| **EXPENSE CHANGE**[b] | | | | | |
| Range | 0.00% – 5.00% | 2.00% – 3.00% | 0.00% – 3.00% | 0.00% – 3.00% | 0.00% – 3.00% |
| Average | 2.70% | 2.70% | 2.33% | 2.60% | 2.58% |
| Change (Basis Points) | | 0 | + 37 | + 10 | + 12 |
| **MARKETING TIME**[c] | | | | | |
| Range | 2 – 15 | 1 – 18 | 1 – 18 | 2 – 18 | 2 – 18 |
| Average | 8.2 | 8.8 | 6.4 | 7.9 | 7.4 |
| Change (▼, ▲, =) | | ▼ | ▲ | ▲ | ▲ |
| **FORECAST VALUE CHANGE**[d] | | | | | |
| Range | 0.0% – 10.0% | (20.0%) – 5.0% | (5.0%) – 5.0% | (5.0%) – 5.0% | (5.0%) – 5.0% |
| Average | 2.8% | (3.6%) | 2.0% | 0.9% | 0.8% |
| Change (▼, ▲, =) | | ▲ | ▲ | ▲ | ▲ |

a. Rate on unleveraged, all-cash transactions b. Year-one rate of change c. In months d. Over next 12 months
Source: PwC Investor Survey; survey conducted by PwC during April 2024

## Rate Selection

### Estimates by Accepted Appraisal Techniques

The overall capitalization rate can be estimated by analysis of equity and mortgage requirements. The derivation of an overall capitalization rate by this method is based on several market rates and assumptions.

| | |
|---|---|
| Holding Period | 10 years |
| Equity Yield Rate | 7.50% |
| Mortgage Interest Rate | 7.00% |
| Mortgage (%) | 70% |
| Equity Requirement | 30% |
| Amortization | 30 years |
| Value Change per Year | 1.0% |

### Band of Investment Analysis

| Mortgage Constant | | Loan Ratio | | Contributions |
|---|---|---|---|---|
| 0.07983630 | x | 70% | = | 5.59% |
| Equity Dividend Rate | | Equity Ratio | | |
| 8.00% | x | 30% | = | 2.40% |
| **Band of Investment Capitalization Rate** | | | | **7.99%** |

The overall capitalization rate indicated through this technique is 7.99%. The above assumptions used to estimate an overall rate were based on current commercial lending parameters at regional lending institutions.

**Reconciliation of Rates:** Assuming sufficient data, the best indicator of cap rates is rates extracted from recent actual sales. The other methods are useful as support, but do not offer direct support for a cap rate conclusion.

**Rate Selection**

**Comparable Cap Rates:**

| Property Address | Property City | Actual Cap Rate | Year Built | Unit SF | Sale Date |
|---|---|---|---|---|---|
| 456 West 19th Street | New York, NY | 6.22 | 2008± | 4,762 | 3/28/2024 |
| 214 West 72nd Street | New York, NY | 6.00 | 2022± | 577 | 9/1/2022 |
| 119-121 2nd Avenue | New York, NY | 4.74 | 2016± | 4,000 | 7/21/2023 |
| 49 West 29th Street | New York, NY | 5.82 | 1915± | 748 | 7/25/2023 |
| 145-147 W 27th Street | New York, NY | 5.45 | 1910± | 2,000 | 4/3/2023 |
| 145 Greene Street | New York, NY | 6.03 | 2003± | 2,932 | For Sale |
| 261 3rd Avenue | New York, NY | 6.01 | 2016± | 7,800 | For Sale |
| 80 E 10th Street | New York, NY | 6.20 | 2019± | 3,000 | For Sale |
| 1833 3rd Avenue | New York, NY | 5.93 | 2022± | 1,763 | For Sale |
| 117 E 29th Street | New York, NY | 6.70 | 1920± | 1,291 | For Sale |
| **Average Cap Rate** | | **5.91** | | | |

**Conclusion:**  The appraiser researched the subject market, for similar sales, which sold with a recorded cap rate. The above comparable sales support a range of cap rates between 4.74% and 6.70%, with an average of 5.91%.

Based on the preceding analysis, it is the appraiser's opinion that a cap rate of **5.75%** is appropriate for the subject units.

## Direct Capitalization of Income

### PRO FORMA ANALYSIS

| | | $/SF | |
|---|---|---|---|
| Gross Unit Area | 4,361 | | |
| Units | 2 | | |
| **Income** | | | |
| Commercial Income | $843,228 | $193.36 | /SF |
| Real Estate Tax,  Insurance & Common Charges Reimbursements | $173,844 | $39.86 | /SF |
| **Total Income (PGI)** | **$1,017,072** | **$233.22** | **/SF** |
| Commercial Vacancy & Collection Loss                -10% | ($101,707) | ($23.32) | /SF |
| **Effective Gross income (EGI)** | **$915,365** | **$209.90** | **/SF** |
| **Expenses** | | | |
| Real Estate Tax | $148,725 | $34.10 | /SF |
| Insurance | $5,167 | $1.18 | /SF |
| Common Charges | $19,953 | $4.58 | /SF |
| Management  (3%) | $27,461 | $6.30 | /SF |
| Utilities | Tenants | | |
| Water & Sewer | Tenants | | |
| Unit Reserves (.25 PSF) | $1,090 | $0.25 | /SF |
| Legal and Professional | $5,000 | $1.15 | /SF |
| **Total Expenses** | **$207,395** | **$47.56** | **/SF** |
| **Income/Expense Ratio** | **23%** | | |
| | | | |
| **Net operating Income** | **707,970** | $162.34 | /SF |
| **Overall Rate** | 5.75% | | |
| **As Is Value Indicator** | **$12,312,515** | **$2,823** | **/SF** |
| **Rounded** | **$12,300,000** | **$2,820** | **/SF** |

Based on the previous analysis and assumptions, the estimated market value by the Income Capitalization Approach is:

### TWELVE MILLION THREE HUNDRED THOUSAND DOLLARS
### $12,300,000

## Reconciliation

The values indicated by the approaches used in this analysis are:

**The Cost Approach:** ................................................................................... **Not Applied**
**The Sales Comparison Approach:**                                            **$12,000,000**
**The Income Capitalization Approach:** ...................................................... **$12,300,000**

The appraiser utilized the sales comparison and income approaches to value. In reconciliation, full weight was placed on the income capitalization approach, as the subject is an income producing property and is purchased by investors for its income producing potential. Furthermore, the units are encumbered in long term leases making the income approach a better indicator. The sales comparison approach was included as a secondary indication of value.

Therefore, it is the opinion of the appraiser, that the As Is Value of the Leased Fee Interest, as of July 3, 2024, is:

**TWELVE MILLION THREE HUNDRED THOUSAND DOLLARS**
**$12,300,000**

## Insurable Value

The appraiser did not include an insurable value since the subject units are part of a larger building.

# Addendum

## Engagement Letter



06/26/2024

Re: Real Estate Appraisals

Yitzchak Tessler

Madison 33 Owner LLC

c/o Tessler Developments LLC

461 Park Avenue South, Second Floor

New York, New York 10016

Dear Mr. Tessler

Pursuant to your request, Republic Valuations is pleased to provide a proposal to appraise the following property.

| 172 Madison Ave #CUA, CUB, New York, NY 10016, USA | |
| --- | --- |
| 863- 1101, 1102 | |
| Property Type | 2 Commercial Condo Units |
| Assignment | Commercial Appraisal Report |
| Valuation Date | Current date |
| Value Type | 1. As Is Value |

| | Turn around | Price |
| --- | --- | --- |
| | 14-21 Days | |

### Objectives

We understand that the objective of this assignment is to provide a professional opinion of the fair market value for Bankruptcy Court purposes.

### Professional fees

The fee for the above service is: as above stated. A 50% deposit is required prior to commencement of the assignment and the balance is due upon completion of the report. In order to proceed on this valuation assignment in a timely manner we require as much of information possible on the subject property, including income and expenses, rent rolls, leases etc. Please provide the contact information for the inspection and financials of the above property.

**Addendum**



**Confidentiality**

Republic Valuations shall not provide a copy of the written Appraisal Report to, or disclose the results of the appraisal prepared in accordance with this Agreement to, any party other than Client, unless Client authorizes, except as stipulated in the Confidentiality Section of the Ethics Rule of the Uniform Standards of Professional Appraisal Practice (USPAP).

**Cancellation**

This Agreement may be cancelled by the Client at any time prior to Republic Valuations's delivery of the Valuation Assignment upon written notification to Republic Valuations. Client shall pay Republic Valuations for work completed on assignment (fee may be adjusted according to assignment status), unless otherwise agreed upon by Republic Valuations and Client in writing.

If this letter correctly states your understanding of the scope of work to be performed, please sign and return to us, as your authorization for us to proceed with this assignment. We are grateful for this opportunity to be of service, and please feel free to contact me if you have any questions or concerns.

Sincerely.

Victor Schlesinger
Certified General R. E. Appraiser
Republic Valuations

Please sign and return:

Accepted by:

x

Print Name

Yitzchuk    Teasler

Title

Managing Member

Date

Phone: 212 526 6500    165 Park Avenue    info@republicvaluations.com
Brooklyn, NY 11205

building
appraising
standards

**Addendum**

## LEASE

AGREEMENT OF LEASE (the "Lease"), dated February 24, 2020, between Madison 33 Owner LLC, a Delaware limited liability company, having an address at 461 Park Avenue South, Second Floor, New York, New York 10016 ("Landlord"), and 209 NYC Dental L.L.P., a New York limited liability company, having an address at 209 East 56th St, New York, NY 10022 ("Tenant").

### 1.    THE DEMISED PREMISES AND TERM

In consideration of the Rent hereinafter reserved and the terms, covenants and conditions set forth in this Lease to be observed and performed by Tenant, Landlord hereby demises and leases to Tenant, and Tenant hereby rents and hires from Landlord a portion ("Demised Premises" or "Premises") of the ground floor and lower level of the building ("Building") known by the street address 172 Madison Avenue, New York, New York, as shown on Exhibit A annexed hereto.

TO HAVE AND TO HOLD the Demised Premises unto Tenant, and the permitted successors and assigns of Tenant, upon and subject to all of the terms, covenants and conditions herein contained.

A.    The term of this Lease (the "Term") shall commence upon the "Commencement Date" (as hereinafter defined) and expire (the "Expiration Date") on the last day of the calendar month in which the tenth (10th) anniversary of the day prior to the Commencement Date occurs.

B.    The "Rent Commencement Date" shall be the day which three hundred sixty-five (365) days following the Commencement Date.

C.    The "Commencement Date" shall mean the date Landlord delivers vacant possession of the Premises to Tenant.

D.    Promptly following the Commencement Date, the parties hereto shall enter into a supplemental certificate fixing the actual Commencement Date and the Rent Commencement Date, in the form which is annexed hereto as Exhibit B, but the failure of the parties to sign such certificate shall not affect the Commencement Date or Rent Commencement Date.

E.    Terms not otherwise defined in the text of this Lease shall have the definitions contained in Article 43 hereof.

### 2.    RENT

A.    During the Term, Tenant promises to pay to Landlord the rent reserved under this Lease, which shall consist of:

(i)    an annual fixed rent (hereinafter, the "Fixed Rent") as follows:

| Lease Years | Annual | Monthly |
|---|---|---|

37893-0/021

NY\54246031.5

## Addendum

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease on the date first above written.

LANDLORD:

By:_____

TENANT:

_209 NYC Dental LLP_

By:_____

37897-0021

NY\54246031.5

70

**Addendum**

### LEASE

AGREEMENT OF LEASE (the "Lease"), dated March 23, 2023, between Madison 33 Owner LLC, a Delaware limited liability company, having an address at 172 Madison Avenue, 27A, New York, New York 10016 ("Landlord"), and Noda North America Inc., a New York corporation, having an address at c/o Shotaro Fukuda, SF Consulting NY, LLC, 477 Madison Avenue, 6th Fl., New York, NY 10022 (prior to the Commencement Date) and 172 Madison Avenue, New York, NY 10016 (from and after the Commencement Date) ("Tenant").

### 1.   THE DEMISED PREMISES AND TERM

In consideration of the Rent hereinafter reserved and the terms, covenants and conditions set forth in this Lease to be observed and performed by Tenant, Landlord hereby demises and leases to Tenant, and Tenant hereby rents and hires from Landlord a portion ("Demised Premises" or "Premises") of the ground floor and cellar of the building ("Building") known by the street address 172 Madison Avenue, New York, New York, as shown on Exhibit A annexed hereto.

TO HAVE AND TO HOLD the Demised Premises unto Tenant, and the permitted successors and assigns of Tenant, upon and subject to all of the terms, covenants and conditions herein contained.

A.   The term of this Lease (the "Term") shall commence upon the "Commencement Date" (as hereinafter defined) and expire (the "Expiration Date") on the last day of the tenth (10th) Lease Year.

B.   The "Rent Commencement Date" shall be the day which is two hundred forty (240) days following the Commencement Date.

C.   The "Commencement Date" shall mean the date Landlord delivers vacant possession of the Premises to Tenant. Notwithstanding anything to the contrary contained in this Lease, prior to the Commencement Date, Tenant shall be permitted reasonable access to the Premises upon reasonable prior notice to Landlord, for the sole and exclusive purpose of, at Tenant's sole cost and expense: conducting inspections thereof and/or performing customary measuring and surveying thereof. Tenant shall not be responsible for the payment of Fixed Annual Rent or Additional Rent to Landlord during such access and any such access shall not be deemed taking possession of the Premises and shall not trigger the Commencement Date.

D.   Promptly following the Commencement Date, the parties hereto shall enter into a supplemental certificate fixing the actual Commencement Date and the Rent Commencement Date, in the form which is annexed hereto as Exhibit B, but the failure of the parties to sign such certificate shall not affect the Commencement Date or Rent Commencement Date.

E.   Terms not otherwise defined in the text of this Lease shall have the definitions contained in Article 43 hereof.

**Addendum**

account of all other sums due and payable under this Lease, notwithstanding any statement or direction by Tenant to the contrary.

G.      Any payment tendered to Landlord by Tenant shall, unless Landlord and Tenant shall otherwise agree, be applied to sums due pursuant to this Article 49 and thereafter on account of all other sums due and payable under this Lease, notwithstanding any statement or direction by Tenant to the contrary.

## 51.   RENT REGULATION

Notwithstanding anything in this Lease to the contrary, should any law or regulation imposing either any of (i) a required rent restriction, abatement, rebate or control; or (ii) any obligation to renew any lease; or (iii) any requirement that any renewal be submitted to arbitration; or (iv) any regulation that otherwise materially restricts Landlord and Tenant's respective rights to freely negotiate renewals of this Lease be imposed on this Lease, on the demised premises or on Tenant and/or Landlord, then, in addition to any other remedies included in this Lease, effective the earlier of the day such regulation is enacted into law or as of day before any such regulation becomes effective, all rights to assign this Lease or to sublet any or all of the demised premises shall be strictly prohibited without the prior written consent of Landlord, which consent may be arbitrarily withheld. Further, if at any time during the Term, the Rent is not fully collectible by reason of any Legal Requirement, Tenant shall enter into such agreements and take such other action as Landlord reasonably requests and which is not prohibited by any Legal Requirement, to permit Landlord to collect the maximum permissible Rent (but not in excess of the Rent). If such Legal Requirement terminates prior to the Expiration Date (a) the Rent shall be paid in accordance with this Lease, and (b) Tenant shall pay to Landlord, if not prohibited by any Legal Requirement, the Rent which would have been paid but for such Legal Requirement, less the actual amount of Rent paid by Tenant to Landlord during the period of such Legal Requirement.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease on the date first above written.

LAMDLORD:
Madison 33 Owner LLC

By: _____

TENANT:
Noda North America Inc.

By: _____
Go Noda, President

**Addendum**

### Rent Roll Provided

5/13/2024                                                                        172 Rent Roll 2024.04.01

## Madison 33 Owner LLC
172 Madison Ave 27A, New York, NY 10016
Tel: 212 869-1900   Fax: 212 997-4119

Madison 33 Owner LLC
Rent Roll as of April 1, 2024

| Lot Number | Name of Tenant | Square Footage | Monthly Rent | 2023 Annual Rent | Next Increase | New Monthly Rent | Lease Commencement Date | Lease End Date |
|---|---|---|---|---|---|---|---|---|
| 1-8693-1101 | 209 NYC Dental LLP | 2,734 | $ 45,972.33 | $ 551,667.96 | 7/1/2024 | $ 47,351.50 | 7/1/2021 | 6/30/2031 |
| 1-8693-1102 | Noda North America Inc | 1,607 | $ 22,917.50 | $ 275,010.00 | 4/1/2025 | $ 23,605.03 | 11/18/2023 | 3/31/2033 |
| Total | | 4,341 | $ 68,889.83 | $ 826,677.96 | | $ 70,956.53 | | |

**Addendum**



## Madison 33 Owner, LLC
461 Park Avenue South, New York, NY 10016

Tel. 212 869-1900  Fax: 212 997-4119

**Balance Sheet**
**For period ending December 31, 2023**

### ASSETS
**Current Assets**

| | |
|---|---:|
| Cash | 52,071.59 |
| Other Current Assets | 135,682.29 |
| **Total Current Assets** | 187,753.88 |

**Other Assets**

| | |
|---|---:|
| Capitalized Construction Costs | (14,524,008.21) |
| Land | 54,769,413.93 |
| **Total Other Assets** | 40,245,405.72 |
| **TOTAL Assets** | 40,433,159.60 |

### LIABILITIES & EQUITY
**Liabilities**

**Current Liabilities**

| | |
|---|---:|
| Accounts Payable | 2,067,797.90 |
| Other Current Liabilities | 7,537,911.13 |
| **Total Other Current Liabilities** | 9,605,709.03 |

**Long Term Liabilities**

| | |
|---|---:|
| DB Loan | 43,588,340.55 |
| **Total Long Term Liabilities** | 43,588,340.55 |
| **Total Liabilities** | 53,194,049.58 |

**Equity**

| | |
|---|---:|
| Retained Earnings | (35,651,383.35) |
| Net Income | (1,327,084.32) |
| Equity All | 24,217,577.69 |
| **Total Equity** | (12,760,889.98) |
| **TOTAL LIABILITIES & EQUITY** | 40,433,159.60 |

**Addendum**



### Madison 33 Owner, LLC
461 Park Avenue South,  New York, NY  10016

Tel: 212 869-1900   Fax: 212 997-4119

**Profit & Loss**
**Year Ending December 2023**

| | | |
|---|---|---:|
| **Income** | | |
| Rental Income | $ | 603,750.42 |
| Sales | $ | - |
| **Total Income** | $ | 603,750.42 |
| | | |
| **Cost of Goods Sold** | $ | - |
| | | |
| **Gross Profit** | $ | 603,750.42 |
| | | |
| **Operating Expense** | | |
| General and Administrative | $ | 857,226.23 |
| Selling Costs | $ | 89,974.84 |
| **Total Operating Expense** | $ | 947,201.07 |
| | | |
| **Net Ordinary Income** | $ | (343,450.65) |
| | | |
| **Other Expenses** | | |
| Bank Interest Expense | $ | - |
| Property Taxes | $ | 983,633.67 |
| **Total Other Expenses** | $ | 983,633.67 |
| | | |
| **Net  Income (Loss)** | $ | (1,327,084.32) |

**Addendum**

**172 MADISON AVE. CONDOMINIUM**
c/o Maxwell-Kates Inc.
9 East 38th Street
New York, NY  10016

**S T A T E M E N T**

| Date | Account |
|------|---------|
| 7/1/2024 | 172000 - 026855 |

MADISON 33 OWNER LLC
461 PARK AVENUE SOUTH
SUITE 200
NEW YORK, NY  10016

**BALANCE DUE**    $14,947.22

Reflects payments received through
6/26/2024

| Date | Unit | Code | Description | Charges | Credits | Amount Due |
|------|------|------|-------------|---------|---------|------------|
| 5/1/2023 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | 227.83 | 783.84 |
| 6/1/2023 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 7/1/2023 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 8/1/2023 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 9/1/2023 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 10/1/2023 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 11/1/2023 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 12/1/2023 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 1/1/2024 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 2/1/2024 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 3/1/2024 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 4/1/2024 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 5/1/2024 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 6/1/2024 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |
| 7/1/2024 | CUA | CCC | COMMON CHARGE COMM'L | 1,011.67 | .00 | 1,011.67 |

Please send this portion of the statement with your remittance.

| Date | Account |
|------|---------|
| 7/1/2024 | 172000 - 026855 |

MADISON 33 OWNER LLC
172 MADISON AVENUE
UNIT CUA

**MAKE CHECKS PAYABLE TO:**    172 MADISON AVE. CONDOMINIUM

**BALANCE DUE**    $14,947.22

Please remit payment to:

**Maxwell-Kates, Inc.**
P.O. Box 354
Emerson, NJ  07630

**Addendum**

**172 MADISON AVE. CONDOMINIUM**
c/o Maxwell-Kates Inc.
9 East 38th Street
New York, NY  10016

**S T A T E M E N T**

| Date | Account |
|------|---------|
| 7/1/2024 | 172000 - 026856 |

**BALANCE DUE**      $11,757.62

Reflects payments received through
6/26/2024

MADISON 33 OWNER LLC
461 PARK AVENUE SOUTH
SUITE 200
NEW YORK, NY  10016

| Date | Unit | Code | Description | Charges | Credits | Amount Due |
|------|------|------|-------------|---------|---------|------------|
| 2/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 670.49 | .00 | 670.49 |
| 3/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 670.49 | .00 | 670.49 |
| 4/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 5/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 6/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 7/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 8/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 9/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 10/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 11/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 12/1/2023 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 1/1/2024 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 2/1/2024 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 3/1/2024 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 4/1/2024 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 5/1/2024 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 6/1/2024 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |
| 7/1/2024 | CUB | CCC | COMMON CHARGE COMM'L | 651.04 | .00 | 651.04 |

Please send this portion of the statement with your remittance.

| Date | Account |
|------|---------|
| 7/1/2024 | 172000 - 026856 |

MADISON 33 OWNER LLC
172 MADISON AVENUE
UNIT CUB

**BALANCE DUE**      $11,757.62

**MAKE CHECKS PAYABLE TO:**    172 MADISON AVE. CONDOMINIUM

Please remit payment to:

**Maxwell-Kates, Inc.**
P.O. Box 354
Emerson, NJ  07630

**Addendum**

## Condo Declaration

**EXHIBIT B**

**DESCRIPTION OF THE UNITS**

**172 MADISON AVENUE CONDOMINIUM**
**172 MADISON AVENUE**
**NEW YORK, NEW YORK 10016**

| Unit Designation | Tax Lot No. | # of Rooms Bedrooms/ Baths | Floor Location in Building | Approx. Area Sq. Ft. | Approx. Sq. Ft. of Limited Residential Common Elements | Percentage of Common Interest | Percentage of Residential Common Interest | Common Elements to which Unit has Immediate Access |
|---|---|---|---|---|---|---|---|---|
| CU-A | 1101 | | | | N/A | 2.5218% | 0.0000% | H, ST |
| Cellar | | N/A | Cellar | 843 | | | | H, ST |
| 1st Floor | | N/A | 1 | 2,754 | | | | ST, PL |
| CU-B | 1102 | | | | N/A | 1.6212% | 0.0000% | H, ST |
| Cellar | | N/A | Cellar | 1,196 | | | | H, ST |
| 1st Floor | | N/A | 1 | 1,607 | | | | ST, PL |
| MSN | 1103 | 4/4.5 | | | | 3.2205% | 3.3600% | EL, ST, T |
| 2nd Floor | | N/A | 2 | | 594 | | | |
| 3rd Floor | | N/A | 3 | 2,958 | 2,948 | | | |
| 4A | 1104 | 2/2.5 | 4 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 5A | 1107 | 2/2.5 | 5 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 6A | 1110 | 2/2.5 | 6 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 7A | 1113 | 2/2.5 | 7 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 8A | 1116 | 2/2.5 | 8 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 9A | 1119 | 2/2.5 | 9 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 10A | 1122 | 2/2.5 | 10 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 11A | 1125 | 2/2.5 | 11 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 12A | 1128 | 2/2.5 | 12 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 14A | 1131 | 2/2.5 | 14 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 15A | 1134 | 2/2.5 | 15 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 16A | 1137 | 2/2.5 | 16 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |

**Addendum**

| Unit Designation | Tax Lot No. | # of Rooms Bedrooms/ Baths | Floor Location in Building | Approx. Area Sq. Ft. | Approx. Sq. Ft. of Limited Residential Common Elements | Percentage of Common Interest | Percentage of Residential Common Interest | Common Elements to which Unit has Immediate Access |
|---|---|---|---|---|---|---|---|---|
| 17A | 1140 | 2/2.5 | 17 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 18A | 1143 | 2/2.5 | 18 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 19A | 1146 | 2/2.5 | 19 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 20A | 1149 | 2/2.5 | 20 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 21A | 1152 | 2/2.5 | 21 | 1,479 | N/A | 1.2605% | 1.3151% | H, EL, ST |
| 22A | 1155 | 2/2.5 | 22 | 1,458 | 56 | 1.2600% | 1.3091% | H, EL, ST, T |
| 23A | 1158 | 2/2.5 | 23 | 1,458 | N/A | 1.2600% | 1.3000% | H, EL, ST |
| 24A | 1161 | 2/2.5 | 24 | 1,458 | N/A | 1.2600% | 1.3000% | H, EL, ST |
| 25A | 1164 | 3/3.5 | 25 | 2,146 | N/A | 1.8290% | 1.9082% | H, EL, ST |
| 26A | 1166 | 3/3.5 | 26 | 2,146 | N/A | 1.8290% | 1.9082% | H, EL, ST |
| 27A | 1168 | 3/3.5 | 27 | 2,146 | N/A | 1.8290% | 1.9082% | H, EL, ST |
| 4B | 1105 | 2/2.5 | 4 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 5B | 1108 | 2/2.5 | 5 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 6B | 1111 | 2/2.5 | 6 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 7B | 1114 | 2/2.5 | 7 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 8B | 1117 | 2/2.5 | 8 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 9B | 1120 | 2/2.5 | 9 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 10B | 1123 | 2/2.5 | 10 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 11B | 1126 | 2/2.5 | 11 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 12B | 1129 | 2/2.5 | 12 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 14B | 1132 | 2/2.5 | 14 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 15B | 1135 | 2/2.5 | 15 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 16B | 1138 | 2/2.5 | 16 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 17B | 1141 | 2/2.5 | 17 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 18B | 1144 | 2/2.5 | 18 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 19B | 1147 | 2/2.5 | 19 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |

Page B-2

{60075817}

**Addendum**

| Unit Designation | Tax Lot No. | # of Rooms Bedrooms/ Baths | Floor Location in Building | Approx. Area Sq. Ft. | Approx. Sq. Ft. of Limited Residential Common Elements | Percentage of Common Interest | Percentage of Residential Common Interest | Common Elements to which Unit has Immediate Access |
|---|---|---|---|---|---|---|---|---|
| 20B | 1150 | 2/2.5 | 20 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 21B | 1153 | 2/2.5 | 21 | 1,488 | N/A | 1.2682% | 1.3231% | H, EL, ST |
| 22B | 1156 | 2/2.5 | 22 | 1,476 | N/A | 1.2459% | 1.3114% | H, EL, ST |
| 23B | 1159 | 2/2.5 | 23 | 1,476 | N/A | 1.2459% | 1.3114% | H, EL, ST |
| 24B | 1162 | 2/2.5 | 24 | 1,476 | N/A | 1.2459% | 1.3114% | H, EL, ST |
| 25B | 1165 | 2/2.5 | 25 | 1,569 | N/A | 1.3372% | 1.3951% | H, EL, ST |
| 26B | 1167 | 2/2.5 | 26 | 1,569 | N/A | 1.3372% | 1.3951% | H, EL, ST |
| 27B | 1169 | 2/2.5 | 27 | 1,569 | N/A | 1.3372% | 1.3951% | H, EL, ST |
| 4C | 1106 | 1/1.5 | 4 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 5C | 1109 | 1/1.5 | 5 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 6C | 1112 | 1/1.5 | 6 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 7C | 1115 | 1/1.5 | 7 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 8C | 1118 | 1/1.5 | 8 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 9C | 1121 | 1/1.5 | 9 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 10C | 1124 | 1/1.5 | 10 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 11C | 1127 | 1/1.5 | 11 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 12C | 1130 | 1/1.5 | 12 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 14C | 1133 | 1/1.5 | 14 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 15C | 1136 | 1/1.5 | 15 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 16C | 1139 | 1/1.5 | 16 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 17C | 1142 | 1/1.5 | 17 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 18C | 1145 | 1/1.5 | 18 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 19C | 1148 | 1/1.5 | 19 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 20C | 1151 | 1/1.5 | 20 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 21C | 1154 | 1/1.5 | 21 | 891 | N/A | 0.7594% | 0.7923% | H, EL, ST |
| 22C | 1157 | 1/1.5 | 22 | 780 | 56 | 0.6762% | 0.7055% | H, EL, ST, T |

**Addendum**

| Unit Designation | Tax Lot No. | # of Rooms Bedrooms/ Baths | Floor Location in Building | Approx. Area Sq. Ft. | Approx. Sq. Ft. of Limited Residential Common Elements | Percentage of Common Interest | Percentage of Residential Common Interest | Common Elements to which Unit has Immediate Access |
|---|---|---|---|---|---|---|---|---|
| 23C | 1160 | 1/1.5 | 23 | 780 | N/A | 0.6643% | 0.6930% | H, EL, ST |
| 24C | 1163 | 1/1.5 | 24 | 780 | N/A | 0.6643% | 0.6930% | H, EL, ST |
| PH-A | 1170 | 0/1 | 28 | 3,548 | 558 | 3.1438% | 3.2789% | EL, ST, T |
| PH-B | 1171 | 0/1 | 29 | 3,548 | 353 | 3.1011% | 3.2333% | EL, ST, T |
| PH-C | 1172 | 0/1 | 30 | 3,548 | 353 | 3.1011% | 3.2333% | EL, ST, T |
| PH-D | 1173 | 0/1 | 31 | 3,548 | 353 | 3.1011% | 3.2333% | EL, ST, T |
| SKY | 1174 | 0/1 | | | | 5.2706% | 5.4980% | EL, ST, T |
| 32nd Floor | | | 32 | 3,548 | 353 | | | |
| 32nd Floor Mezz. | | | 32 Mezz. | 1,058 | 173 | | | |
| 33rd Floor | | | 33 | 848 | 2401 | | | |
| TOTALS | | | | 116,877 | 8,198 | 100.0000% | 100.0000% | |

H – Hallway    Mansion – MSN
EL–Elevator    Skyhouse – SKY
PL–Public Plaza
ST – Stairway
T – Terrace

**Addendum**

### ZD1



**Addendum**



**Addendum**



**Addendum**



*Republic Valuations*

**Addendum**



## Qualifications of Victor Schlesinger

QUALIFICATIONS OF VICTOR SCHLESINGER

New York State Certified General Real Estate Appraiser

Victor Schlesinger is the President of Republic Valuations, a firm providing real estate appraisal and consulting services. The following is a summary resume of his background and experience.

EXPERIENCE

Mr. Schlesinger has more than 25 years of experience as a real estate appraiser, arbitrator and consultant in the fields of real estate and urban economics. He has conducted numerous real estate appraisals of Restaurants, research and development (R&D) buildings, industrial facilities, retail stores and shopping centers, hotels, multifamily apartments, condominiums and vacant land. Mr. Schlesinger's real estate appraisal expertise is focused on urban/suburban buildings, development projects and land. He has extensive experience in appraising real estate for condemnations, rental and other analysis, arbitration matters, property tax assessment appeals, and mortgage loans. Appraisals and valuation of leasehold, Fee Simple and other real estate interests are standard areas of practice. Mr. Schlesinger is an Associate Member of the Appraisal Institute and is licensed as a New York State Certified General Real Estate appraiser.

Mr. Schlesinger frequently provides litigation support and serves as an expert witness in court or in private arbitration proceedings. He also acts as either a neutral or party arbitrator in resolving matters of real estate values, rents and related issues. He has been qualified as a real estate appraisal expert and provided testimony in the New York court system and in the Federal United States Courts. Other related experience includes teaching, speaking and publications on various facets of real estate analysis, arbitration and market research.

Republic Valuations is a real estate appraisal and consulting firm that employs a large team of Certified General Appraisers, MAI's and Associate Appraisers licensed in most of the continental US, all working in collaboration to deliver high quality appraisals in a timely manner.

The firm constantly provides valuation and consulting services on many standard and complex property types throughout the extended Tri State area to a wide range of clients. Mr. Schlesinger has overall management responsibility for the firm, as well as being the partner in charge of many specific appraisals, arbitration and consulting assignments.

## Qualifications of Victor Schlesinger

**PROFESSIONAL AFFILIATIONS & STATE CERTIFICATION**
State of New York Certified General Real Estate Appraiser No. 46000047078
State of New Jersey Certified General Real Estate Appraiser No. 42RG00225700
State of Tennessee Certified General Real Estate Appraiser No. 5592
State of Georgia Certified General Real Estate Appraiser No. 382627
State of Connecticut Certified General Real Estate Appraiser No. RCG0001561
Commonwealth of Pennsylvania Certified General Real Estate Appraiser No. GA004504
State of Maryland Certified General Real Estate Appraiser No. 34261
State of Rhode Island Certified General Real Estate Appraiser No. CGA.0020121
Commonwealth of Kentucky Certified General Real Estate Appraiser No. 5785
State of Texas Certified General Real Estate Appraiser No. TX 1381137 G
State of Kansas Certified General Real Estate Appraiser G – 3463
State of Florida Certified General Real Estate Appraiser RZ4291
State of Delaware Certified General Real Estate Appraiser No. XI-0010754
State of Utah Certified General Real Estate Appraiser 12623757-CG00
State of Alabama Certified General Real Estate Appraiser G01561
State of Oklahoma Certified General Real Estate Appraiser 13664CGA
State of Massachusetts Certified General Real Estate Appraiser 1000253.
State of South Carolina Certified General Real Estate Appraiser AB .8508 CG
State of North Carolina Certified General Real Estate Appraiser A9074
State of Arizona Certified General Real Estate Appraiser CGA-1048172
State of Colorado Certified General Real Estate Appraiser CG200003326
State of Mississippi Certified General Real Estate Appraiser GA-1455
State of Missouri Certified General Real Estate Appraiser 2023007972
State of Illinois Certified General Real Estate Appraiser 553.003039
State of Indiana Certified General Real Estate Appraiser CG42300054

## Qualifications of Victor Schlesinger





republic
valuations

Phone. 212.228.6900

184 Park Avenue
Brooklyn, NY 11205

info@republicvaluations.com
republicvaluations.com

Raising
appraising
standards